Oliver Wood
Oliver Wood Law, PLLC
P.O. Box 581312
Salt Lake City, Utah 84158
(206) 351-5320
ofinnwood@gmail.com

Alizabeth A. Bronsdon
Bronsdon Law Firm, PLLC
P.O. Box 7262
Missoula, MT 59807
(267) 664-3422
bronsdonlaw@gmail.com

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES, a non-profit organization; NATIVE ECOSYSTEMS COUNCIL, a non-profit organization; COUNCIL ON WILDLIFE AND FISH, a non-profit organization; and YELLOWSTONE TO UINTAS CONNECTION, a non-profit organization,<br><br>        Plaintiffs,<br><br>vs.<br><br>WILLIAM MULHOLLAND, in his official capacity as Tally Lake District Ranger, Flathead National Forest; and | CV–<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

1

| the UNITED STATES FOREST SERVICE, a federal agency,<br><br>Defendants. | |

## I.    INTRODUCTION

1.    Plaintiffs bring this civil action against Defendants under the citizen suit provision of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, for violations of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4331 *et seq.*, the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600 *et seq.*, and the Healthy Forest Restoration Act ("HFRA"), 16 U.S.C. §§ 6591 *et seq.*

2.    On April 3, 2024, Tally Lake District Ranger William Mulholland authorized a major logging project on the Flathead National Forest ("Forest"), approximately 13 miles west of Whitefish, Montana.

3.    Elevating continued timber production and enhanced recreation above conserving important habitat in a critical linkage area for imperiled wildlife, the Round Star Vegetation Management Project ("Round Star Project" or "Project") will log and clearcut mature forest, build roads and trails that destroy and fragment habitat, displace wildlife, alter hydrology, and adversely affect threatened grizzly bears, Canada lynx, bull trout, and North American wolverines.

4.    The Decision authorizes logging on 9,151 acres, including 6,324 acres of

commercial logging and clearcutting, in lynx critical habitat and grizzly bear secure core habitat. The Forest Service admits that the Project will reduce ungulate hiding cover and snow intercept (the amount of snow that is captured by a forest canopy) in elk and white-tailed deer winter range habitat for at least 20 years.

5.    The Decision authorizes the construction of 18.7 miles of new permanent National Forest System roads, 3.4 miles of temporary roads, and 5.6 miles of new trails, an expanded parking area, and a new warming shelter and equipment storage building at the Round Meadow trailhead.

6.    Although 78% of the Project area is National Forest System land—and only 15% of the land is private—the Forest Service claims that 92% of Project activities will occur in the wildland urban interface ("WUI"). By doing so, the Forest Service feigns permission to log and burn WUI lands, even when doing so will harm wildlife and critical habitat protected under Forest Plan standards and the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq*. But the WUI definition employed by the Forest Service is overinclusive and illegal.

7.    Plaintiffs attest that Defendants' decision to authorize extensive logging, clearcutting, burning, thinning, and to build new roads, trails, and structures in the Round Star Project area is arbitrary and capricious, an abuse of discretion, and/or otherwise not in accordance with law.

8.    Defendants' actions or omissions violate NEPA, NFMA, HFRA, and the

APA by failing to take a hard look at the impacts of Project activities on wildlife, wildlife habitat, climate, and connectivity within the Project planning area as authorized by the Decision.

9.     As of the date of this filing, to the best of Plaintiffs' knowledge, the Forest Service has not yet advertised a sale under this Project.

10.     Because the Forest Service's approval of the Round Star Project violates federal law, Plaintiffs request the Court set aside and enjoin the implementation of the Round Star Decision—and specifically enjoin any ground disturbing activities authorized by the Decision Notice—pursuant to 5 U.S.C. § 706(2)(A) and (D).

11.     Plaintiffs seek a declaratory judgment, injunctive relief, the award of costs and expenses of suit, including attorney and expert witness fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and such other relief as this Court deems just and proper.

## II.     JURISDICTION AND VENUE

12.     This action arises under the laws of the United States and involves the United States as a Defendant. Therefore, this Court has subject matter jurisdiction over the claims specified in this Complaint pursuant to 28 U.S.C. §§ 1331 (federal question), 1346 (United States as a defendant), and 2202 (declaratory judgment and further relief).

13.     Venue is proper in this Court under 28 U.S.C. § 1391(e) and Local Rule

3.2(b) because it is where a substantial part of the events or omissions giving rise to the claims occurred, and the federal public lands and agency records at issue are located in the United States District Court for the District of Montana.

14.    Plaintiffs submitted timely written comments and an objection concerning the Project and fully participated in the available administrative review processes, thus exhausting their administrative remedies. Defendants' issuance of the April 3, 2024 Decision was a final administrative action of the U.S. Forest Service. Thus, the Court has jurisdiction to review Plaintiffs' APA claims.

### III.    PARTIES

15.    Plaintiff Alliance for the Wild Rockies ("Alliance") is a tax-exempt, non-profit public interest organization dedicated to the protection and preservation of the native biodiversity of the Northern Rockies Bioregion, its native plant, fish, and animal life, and its naturally functioning ecosystems. Alliance's registered office is located in Missoula, Montana, and it has over 2,000 individual members, many of whom reside in Montana. Members and staff of Alliance observe, enjoy, and appreciate the Flathead National Forest's native wildlife, water quality, and terrestrial habitat quality, and expect to continue to do so in the future, including in the Project area. Alliance's members' professional and recreational activities are directly affected by Defendants' failure to perform their lawful duty to protect and conserve these ecosystems as set forth below. Alliance brings this action on its

own behalf and on behalf of its adversely affected members.

16.    Plaintiff Native Ecosystems Council ("NEC") is a non-profit corporation with its principal place of business in Three Forks, Montana. NEC is dedicated to the conservation of wildlife and public lands in the Northern Rockies, including in Montana. In furtherance of this mission, NEC's members and supporters remain active in wildlife management, including grizzly bear, Canada lynx, and wolverine conservation. Its members use and will continue to use the Project area for work and for outdoor recreation of all kinds, including fishing, hunting, hiking, wildlife viewing, horseback riding, and cross-country skiing. Its members' professional and recreational activities are directly affected by Defendants' failure to perform their duties. Native Ecosystems Council brings this action on its own behalf and on behalf of its adversely affected members.

17.    Plaintiff Council on Wildlife and Fish ("CWF") is a public interest organization (tax-exempt, non-profit) formed to insure the maintenance of biological diversity and the ecological integrity of all natural ecosystems through the enforcement and administration of laws such as the ESA, NFMA, NEPA, the Clean Water Act, and all other laws that require the recognition, discussion and conservation of such ecosystems and protect the organic or inorganic components that comprise such natural ecosystems. CWF's registered office is in Bozeman, Montana, and its members are in Montana. They enjoy and appreciate indigenous

wildlife, fish, spiritual connection and renewal, clean water, and high-quality aquatic and terrestrial habitat. Its members expect to continue these practices well into the future, including in the Round Star Project area. CWF's members' professional, spiritual and recreational activities are directly affected by Defendants' failure to perform their lawful duty to protect and conserve these ecosystems as set forth below. CWF brings this action on its own behalf, on behalf of its adversely affected members, and on behalf of numerous, voiceless life forms imminently threatened with displacement, injury, and/or death.

18.     Plaintiff Yellowstone to Uintas Connection ("Y2U") is a non-profit organization dedicated to protecting the integrity of habitat for native fish and wildlife in the wildlife corridor that connects the Greater Yellowstone Ecosystem and Northern Rockies to the Uinta Wilderness and Southern Rockies. Members of Y2U work to restore fish and wildlife habitat in the Yellowstone to Uintas Corridor through the application of science, education, and advocacy. Y2U's members' professional and recreational activities are directly affected by Defendants' failure to perform their lawful duty to protect and conserve these ecosystems by approving the Round Star Project. Y2U brings this action on its own behalf and on behalf of its adversely affected members.

19.     The interests at stake in this matter are germane to Plaintiffs' organizational purposes. In addition, the members and/or staff of the Alliance, NEC, CWF, and

Y2U (collectively, "Conservation Groups") include individuals who use and intend to continue to use the Flathead National Forest, including the lands that will be logged as part of the Round Star Project. Defendants' failure to prepare an adequate environmental assessment and violations of the Forest Plan and HFRA will harm plant, fish, and animal life and natural ecosystems in the Forest and thereby injure Plaintiffs' members who use and enjoy those resources.

20.     For example, Steve Kelly, President of Council on Wildlife and Fish and a co-founding member of the Alliance for the Wild Rockies, resides in Montana, and spent many days in the mid-1980s planting trees on Forest Service and United States Department of Agriculture clearcuts in and around the Round Star Project area in the Tally Lake Ranger District. Mr. Kelly had friends in the Star Meadows area, which he visited in the early 1990s. He has walked in the Project area numerous times enjoying the remaining mature and old-growth forest habitat and observing wildlife in those forest areas of calm, peace, and solitude. Mr. Kelly has specific plans to return to the Project area in the summer of 2028 and again in the future. His opportunity to enjoy this beautiful forest will be irrevocably damaged by the proposed logging and road construction authorized by the Project Decision.

21.     Other Conservation Group members and staff use and have plans to use the Project area for observation, research, aesthetic enjoyment, and other recreational, scientific, spiritual, and educational activities, including to enjoy the Project area's

natural character and to observe and/or study imperiled species. These members'

interests will be irreparably harmed by the planned logging, burning, and road, trail

and structure building in the Project area, as they will not be able to enjoy this area

in its unlogged state any longer, nor will they be able to observe or attempt to

observe the species that use and are dependent on these areas in their unlogged

state. Logging these areas for the Project in violation of environmental statutes will

undermine the Conservation Groups' mission of protecting wild places and

wildlife and ensuring that the Forest Service complies with all applicable laws,

regulations, and procedures pertaining to the management of national forest lands.

22.    These are actual, concrete injuries caused by Defendants' failure to comply

with mandatory duties under NEPA, NFMA, HFRA, and the APA. The requested

relief would redress these injuries, and this Court has the authority to grant the

requested relief under 28 U.S.C. §§ 2201 and 2202, and 5 U.S.C. §§ 705 and 706.

23.    Defendant William Mulholland is sued in his official capacity as the District

Ranger of the Tally Lake Ranger District of the Flathead National Forest. He is

directly responsible for forest management in the Tally Lake Ranger District and

for ensuring that all resource management decisions comply with applicable laws

and regulations. On April 3, 2024, District Ranger Mulholland signed the Decision

Notice for the Project challenged here. His office denied Plaintiffs' objections.

24.    Defendant United States Forest Service ("Forest Service") is an

administrative agency within the United States Department of Agriculture. The Forest Service holds the national forests in trust for the American people and is responsible for the lawful management of our national forests, including the Flathead National Forest.

## IV.    LEGAL FRAMEWORK

**The National Environmental Policy Act**

25.    Congress enacted NEPA, 42 U.S.C. §§ 4321–4370h, to, among other things, "encourage productive and enjoyable harmony between man and his environment[,]" and to promote government efforts "that will prevent or eliminate damage to the environment."

26.    As a general matter, NEPA requires that federal agencies analyze and disclose to the public the environmental impacts of their actions. § 4332(C).

27.    The Council on Environmental Quality ("CEQ") promulgates regulations implementing NEPA. The rules are intended "to ensure Federal agencies consider the environmental impacts of their actions in the decision-making process[,]" including that "all relevant environmental information . . . is identified and considered early in the process[,]" and that "the public has been informed regarding the decision-making process." 40 C.F.R. § 1500.1(a)–(b).

28.    To fulfill its mandates, NEPA requires federal agencies to prepare an environmental impact statement ("EIS") for all "major Federal actions significantly

affecting the environment." 42 U.S.C. § 4332(C); 40 C.F.R. § 1500.1(a).

29.    Where an agency is uncertain whether it must prepare an EIS, it must first prepare an environmental assessment ("EA") to determine whether the action may have significant impacts and thus require preparation of an EIS. 42 U.S.C. § 4336(b)(2); 40 C.F.R. § 1501.6.

30.    Federal agencies must take a "hard look" at the reasonably foreseeable environmental consequences of their actions and a reasonable range of alternatives that may avoid or minimize adverse impacts or enhance the quality of the human environment. *Earth Island Inst. v. United States Forest Serv.*, 351 F.3d 1291, 1300 (9th Cir. 2003); 42 U.S.C. § 4332(C)(i)–(iii).

31.    The information in an EA must demonstrate "professional integrity, including scientific integrity," and the information upon which the agency relied and its limitations must be disclosed to the public. § 4332(C)–(J).

32.    NEPA requires that agencies "succinctly describe the environment of the area(s) to be affected or created by the alternative under consideration." § 1502.15. The action agency must set an appropriate baseline detailing the nature and extent of the resources in the area. "The concept of a baseline against which to compare predictions of the effects of the proposed action and reasonable alternatives is critical to the NEPA process." Council on Environmental Quality, *Considering Cumulative Effects under the National Env't Policy Act* 41 (January 1997).

33.    Under the statute, an EA must identify the effects or impacts of each reasonable alternative and provide a detailed statement including "[r]easonably foreseeable environmental effects of the proposed agency action;" "any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented;" and "a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal." 42 U.S.C. § 4332(C)(i)–(iii).

34.    Under NEPA's implementing regulations, an EA must identify and take a "hard look" at the direct, indirect, and cumulative impacts of each reasonable alternative, including a project's ecological, aesthetic, economic, social, and health effects. 40 C.F.R. § 1508.1(g), (g)(4).

35.    Direct effects are those impacts that are "caused by the action and [that] occur at the same time and place." § 1508.1(g)(1).

36.    Indirect effects are caused by the action but occur later in time or farther in distance and "are still reasonably foreseeable[,]" including "growth inducing effects and other effects" related to land use, population density or growth rate, and "effects on air and water and other natural systems." § 1508.1(g)(2).

37.    Cumulative effects are impacts to the environment that result from the

"incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative effects can result from individually minor but collectively significant actions taking place over a period of time." § 1508.1(g)(3).

**The National Forest Management Act**

38.    Under the first stage of NFMA's two-stage approach to managing national forests, the Secretary of Agriculture must "develop, maintain, and, as appropriate, revise land and resource management plans," commonly referred to as "forest plans," for each forest in the National Forest System. 16 U.S.C. § 1604(a).

39.    Forest plans "guide sustainable, integrated resource management" of forest lands that are "ecologically sustainable[,] contribute to social and economic sustainability[,]" and "consist of ecosystems and watersheds with ecological integrity and diverse plant and animal communities." 36 C.F.R. § 219.1(b), (c).

40.    In developing forest plans, the Forest Service must comply with NEPA. 16 U.S.C. § 1604(g)(1). NFMA also imposes substantive requirements, which are promulgated as regulations. *See* 16 U.S.C. § 1604(g); 36 C.F.R. §§ 219 *et seq*.

41.    Forest Plan "standards" are "mandatory constraint[s] on project and activity decisionmaking that is established to help achieve or maintain the desired condition or conditions, to avoid or mitigate undesirable effects, or to meet

applicable legal requirements." 36 C.F.R. § 219.7(e)(1)(iii).

42.    Forest Plan "guidelines" are "constraints on project and activity decisionmaking that allow for departure from its terms so long as the purpose of the guideline is met. Guidelines are established to help achieve or maintain a desired condition or conditions, to avoid or mitigate undesirable effects, or to meet applicable legal requirements." § 219.7(e)(1)(iv).

43.    To comply with the second stage of NFMA's forest management approach, the Forest Service must ensure that all site-specific projects, permits, resource plans, or other instruments allowing use and occupancy of the forest lands are consistent with the provisions of the relevant forest plan. 16 U.S.C. § 1604(i).

44.    "A project is consistent if it conforms to the applicable 'components' of the forest plan, including the standards, guidelines, and desired conditions that are set forth in the forest plan." *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1110 (9th Cir. 2018). In other words, the agency's failure to satisfy the substantive provisions in the forest plan is a violation of NFMA.

45.    In 2018, through the NEPA process, the Forest Service updated its longstanding Flathead National Forest Land Management Plan ("Forest Plan"). The agency's NEPA review included preparing a final EIS and biological assessments for the ESA-protected grizzly bear, bull trout and designated bull trout critical habitat, and Canada lynx and lynx critical habitat.

14

46.    The Round Star Project EA "tiers" to the analyses in the Forest Plan.

47.    "Tiering is defined as avoiding detailed discussion by referring to another document containing the required discussion." *All. for the Wild Rockies*, 907 F.3d at 1118 (internal quotation marks omitted).

48.    "Tiering is appropriate . . . [f]rom a programmatic, plan, or policy environmental impact statement or environmental assessment to a program, plan, or policy statement or assessment of lesser or narrower scope or to a site-specific statement or assessment." 40 C.F.R. § 1501.11; *see also Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 757 (9th Cir. 1996) ("The forest and site-specific plans may be incorporated by reference, or 'tiered'—so that the site-specific plan need not reiterate issues adequately discussed in the forest plan.").

49.    "However, tiering to a document that has not itself been subject to NEPA review is not permitted, for it circumvents the purpose of NEPA." *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1066 (9th Cir. 2002).

50.    Similarly, at the project-level, the Forest Service cannot rely on new data or create new habitat maps that remove areas within a project's boundaries from programmatic-level protections without conducting a new NEPA analysis on the effects of such remapping. *See Native Ecosystems Council v. U.S. Forest Serv. ex rel. Davey*, 866 F. Supp. 2d 1209, 1225 (D. Idaho 2012); *All. for the Wild Rockies v. U.S. Forest Serv.*, 2023 WL 5427921, *7 (Aug. 23, 2023).

**The Healthy Forest Restoration Act**

51.    HFRA encourages the Forest Service to "implement hazardous fuel reduction projects" on "Federal land in wildland-urban interface areas" to "reduce wildfire risk to communities, municipal water supplies, and other at-risk Federal land through a collaborative process of planning, prioritizing, and implementing hazardous fuel reduction projects." 16 U.S.C. §§ 6501(1), 6512(a)(1).

52.    In satisfying HFRA, the Forest Service must comply with NEPA. § 6514(a)(1).

53.    HFRA, § 6511(16), defines the WUI as:

(A) an area within or adjacent to an at-risk community that is identified in recommendations to the Secretary in a community wildfire protection plan; or

(B) in the case of any area for which a community wildfire protection plan is not in effect—

(i)  an area extending 1⁄2-mile from the boundary of an at-risk community;

(ii) an area within 1.5 miles of the boundary of an at-risk community, including any land that—(I) has a sustained steep slope that creates the potential for wildfire behavior endangering the at-risk community; (II) has a geographic feature that aids in creating an

effective fire break, such as a road or ridge top; or (III) is in

condition class 3, as documented by the Secretary in the project-

specific environmental analysis; and

(iii) an area that is adjacent to an evacuation route for an at-risk

community that the Secretary determines, in cooperation with the

at-risk community, requires hazardous fuel reduction to provide

safer evacuation from the at-risk community.

54.    An "at-risk community" is defined as an area:

(A) that is comprised of —

(i) an *interface community* as defined in the notice entitled "Wildland

Urban Interface Communities Within the Vicinity of Federal

Lands That Are at High Risk from Wildfire" issued by the

Secretary of Agriculture and the Secretary of the Interior . . . [*see*

66 Fed. Reg. 751, 753 (Jan. 4, 2001) ("hereinafter Notice")]; or

(ii) a *group of homes* and other structures with basic infrastructure

and services (such as utilities and collectively maintained

transportation routes) within or adjacent to Federal land;

(B) in which conditions are conducive to a large-scale wildland fire

disturbance event; and

(C) for which a significant threat to human life or property exists as a result

of a wildland fire disturbance event.

§ 6511(1) (emphasis added).

55.    The Notice states that an "urban wildland interface community exists where humans and their development meet or intermix with wildland fuel." Notice, 66 Fed. Reg. at 753. Whitefish, which sits approximately 13 miles east of the Project area, is an "urban wildland interface community" at high risk from wildfire because it is explicitly listed as such in the Notice. Notice, 66 Fed. Reg. at 767.

56.    The Notice further describes the three categories of "interface" communities:

(1) *Interface Community*—"where structures directly abut wildland fuels" with a development density of "usually 3 or more structures per acre" or "population density of 250 or more people per square mile";

(2) *Intermix Community*—"where structures are scattered throughout a wildland area" with a development density "rang[ing] from structures very close together to one structure per 40 acres" or "population density of between 28–250 people per square mile"; or

(3) *Occluded Community*—"where structures abut an island of wildland fuels" with a development density "similar to those found in the interface community, but the occluded area is usually less than 1,000 acres in size." Notice, 66 Fed. Reg. at 753.

**The Administrative Procedure Act**

57.    Because neither NEPA, NFMA nor HFRA include a citizen suit provision, this case is brought pursuant to the APA. 5 U.S.C. §§ 551–59, 701–06.

58.    The APA allows persons and organizations to challenge final agency actions in the federal courts. §§ 702, 704.

59.    The APA declares that a court shall hold unlawful and set aside agency actions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. § 706(2)(A).

60.    An action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## V.    FACTUAL ALLEGATIONS

61.    The Round Star Project is located approximately 13 miles west of Whitefish, Montana, on the Flathead National Forest in the Tally Lake Ranger District.

62.    The Forest Service initiated scoping for the Project on December 8, 2021.

63.    On June 17, 2022, the Forest Service published its legal notice for a 30-day comment period on the Round Star Project's EA. In response to the Draft EA, the

Forest Service received 21 comment letters, including comments from Conservation Groups.

64.    In August 2022, the Forest Service released its Draft Decision Notice and updated EA, beginning the 45-day objection period. The Forest Service received eight objections to the Project. Conservation Groups filed objections to the Draft Decision Notice and updated EA.

65.    On April 3, 2024, the Forest Service published its Final EA and Decision Notice and Finding of No Significant Impact ("FONSI").

**Round Star Project Area**

66.    The Round Star Project area encompasses 28,300 acres of national forest, state, and private land that currently provides habitat for Canada lynx, grizzly bears, elk, moose, and other wildlife native to the Northern Rockies.

67.    There is a high density of roads across the area that facilitates access for trapping, hunting, firewood cutting, and other activities. Public recreation is popular within the Project area, especially in and around Round Meadow.

68.    The Decision Notice for the Project authorizes logging and clearcuts on approximately 9,151 acres in designated lynx critical habitat, including:

- 2,827 acres of noncommercial treatments;
- 6,324 acres of commercial treatments;
- 18.7 miles of new road construction;

- 3.4 miles of temporary roads; and

- 5.6 miles of new trails.

69. The Decision also converts 0.7 miles of road from barriered to gated.

70. Implementation will take five to 10 years depending on funding.

71. Noncommercial treatments will include:

- 2,481 acres of precommercial thinning;

- 15 acres of post and pole thinning;

- 197 acres of thinning from below; and

- 134 acres will be treated by prescribed fire.

72. Commercial treatments will include:

- 3,469 acres of commercial thinning;

- 503 acres of improvement cuts;

- 52 acres of hardwood release;

- 1,270 acres of seed tree cuts; and

- 580 acres of clearcuts.

73. The Final EA refers to "hardwood release," "seed tree," and "clearcuts" as "regeneration treatments," which is a more palatable way to describe cutting down the majority of the trees in order to return large swaths of mature forest to an even-aged seedling stage.

74. The Round Star Project lists the following four objectives: (1) reduce tree

densities and fuel loadings within the WUI to result in less intense fire behavior near communities and improve egress access to facilitate safer wildland fire operations; (2) improve the diversity and resilience of vegetative communities; (3) contribute to continued timber production and economic sustainability; and (4) enhance and expand high quality recreation opportunities in the Round Meadow area.

**Wildland Urban Interface Designation**

75.    The Decision Notice states that 92% of authorized treatment units are located within the WUI. The Project will log and/or burn 8,430 acres of land in the WUI, including Canada lynx winter foraging habitat "[a]s authorized under the forest plan lynx exemptions."

76.    According to the EA, the WUI for the Project is based on the 2011 and 2021 Flathead County community wildfire protection plans.

77.    Flathead County's 2021 plan defined the WUI as:

> [A]ny location where a fire can readily spread from vegetation (wildland fuels) to manmade structures (urban fuels). This is generally measured geographically as a 1.5-mile zone around areas with structures (e.g. homes, businesses, and outbuildings); public works facilities (e.g. drinking water and sewer); and critical infrastructure (e.g. power lines, gas lines, pipelines, bridges, railways, emergency communication sites, and watersheds).

78.    However, Flathead County's 2021 plan does not define any "at-risk" communities, "interface" communities, "intermix" communities, or "occluded"

communities as defined by federal law. Nor does Flathead County quantify or

define the densities of any relevant "at-risk" communities, as required by HFRA.

79.    Rather, Flathead County's WUI is plainly overinclusive, extending well-

beyond any homes, roads, or structures indicating a significant threat from wildfire

to human life or property.

80.    The Forest Service mapped the WUI boundary for the Round Star Project

via a process delineated in a document entitled "Flathead National Forest 2024

HFRA Analysis Process."

81.    In that document, the Forest Service explained that it created the WUI

boundary for the Round Star Project "by hand drawing a polygon around the

clusters of buffers that had more than one structure within it." Specifically,

> Criteria for defining this buffer was determined to focus on steep
> terrain. The WO guidance is to use slopes greater than 30% for the 1.5-
> mile buffer and that the buffer applies to [the] entire perimeter of the
> community even if the slope doesn't. After reviewing the slope, it was
> determined that we would use the 1.5[-]mile buffer for the entire Forest
> as there are steep slope[s] in proximity to all communities that will
> generate accelerated fire behavior. The Communities layer created
> above was buffered by 2414.02m (equivalent to 1.5 miles).

82.    But the Forest Service's decision to use a 1.5-mile buffer around undefined

communities does not satisfy any of HFRA's categories of WUI.

83.    Further, in support of its decision to use a 1.5-mile WUI buffer, the Forest

Service arbitrarily determined that the slope across the entire Project area was over

30 degrees without providing any mapping of the communities in the Project area that are surrounded by sloped terrain greater than 30 degrees.

84.    And applying the 1.5-mile buffer due to steep terrain is unsupported by the record. For example, the Forest Plan considers the Tally Lake Ranger District to be "relatively low [in elevation] and the terrain relatively rolling when compared to the rest of the Forest[.]" The Heritage Report in the Project file describes the Project area as within the Salish geographic area, which "lies in the relatively gently sloped, rolling terrain of the Salish Mountain range and includes most of the main Flathead River valley."

85.    Also, the analyses in the Forest Plan EIS relied on the WUI from the 2011 Flathead County Community Wildfire Protection Plan, which defined the WUI more narrowly than the county's 2021 plan, on which the Project WUI is based. Thus, the effects analyses in the Forest Plan EIS assumed that a smaller percentage of the Forest could be exempted under HFRA—or in other words, that a larger percentage would be protected by the Forest Plan's vegetation standards.

86.    Internally, the Forest Service was aware that the analysis in the Forest Plan EIS relied on a smaller WUI than the Round Star Project EA. Moreover, the agency noted that the Northern Rockies Lynx Management Direction ("NRLMD"), which established the minimum lynx standards that were later incorporated into the Forest Plan, "consulted on WUI in a generic way as 0.5 mile from an at-risk

24

community," which it defined as a community with greater than 28 people per square mile.

87.    In other words, the Forest Service knew that it could not and should not tier its effects analyses in the Round Star Project EA to the Forest Plan EIS or the NRLMD because each level of programmatic planning had increased the size of the WUI, meaning the amount of affected habitat under consideration was not consistent between the three documents.

88.    However, rather than reconsidering the impacts in light of the expanded WUI at the Project level and forest wide, the Forest Service unlawfully tiered its project-level analysis to the discussions in the NRLMD and the Forest Plan EIS.

89.    Therefore, the agency's failure to analyze this expansion of the WUI for the Round Star Project violates NEPA and NFMA.

90.    Relatedly, as discussed further below, because the Project's WUI fails to comply with HFRA, the Forest Service cannot rely on exemptions in the Forest Plan to authorize the logging and burning of lynx habitat inside the expanded WUI.

**Canada Lynx and Canada Lynx Critical Habitat**

91.    Canada lynx ("lynx") are medium-sized cats with large, furry feet adapted to walking on deep, fluffy snow, long legs, tufts on the ears, and black-tipped tails.

92.    In 2000, the U.S. Fish and Wildlife Service listed lynx in the lower 48 states as a threatened species under the ESA and later designated lynx critical habitat.

93.    The Flathead National Forest is identified as core lynx habitat, meaning lynx have been consistently found in the Forest and there is recent evidence of reproduction. Lynx are present in the Round Star Project area, and their main prey, snowshoe hares, are common throughout the Tally Lake Ranger District.

94.    Lynx require boreal forest landscapes with a mosaic of successional forest stages containing the following components: (1) snowshoe hare habitat, which includes dense understories of young trees, shrubs, or overhanging boughs that protrude above the snow and mature multistoried stands with conifer boughs touching the snow surface; (2) extended periods of deep and fluffy winter snow conditions; (3) denning habitat with abundant coarse woody debris, like down logs or root wads; and (4) matrix habitat, which includes hardwood forest, dry forest, non-forest, or other habitat types occurring between patches of boreal forest in close juxtaposition.

95.    Lynx productivity is highly dependent on the quantity and quality of winter snowshoe hare habitat. (Productivity is the ability of an organism to successfully reproduce.)

96.    Activities such as logging, fire suppression, and livestock grazing can affect the amount, distribution, and condition of lynx denning and winter snowshoe hare habitat.

97.    Activities that result in providing access to other predators are also a

potential risk to lynx. Such activities include certain types of winter recreation, the winter use of forest roads and trails, and other human developments.

98.    For example, landscape-scale fragmentation directly affects lynx by creating openings that increase access by competing carnivores such as coyotes and mountain lions, especially in the winter when lynx have traditionally been able to exploit their evolutionary edge in places where deep, soft snow tends to exclude other predators during the time of year that prey is most limiting.

99.    Because logging eliminates snowshoe hare, mature, and multistoried lynx habitat, the best available science finds logging negatively impacts lynx productivity and foraging habitat. Regeneration harvest treatments (clearcuts, etc.) "take about 40 years to reach predicted lynx use (Holbrook et al. 2018)."

100.    Similarly, thinning reduces stem densities to increase the growth of the remaining trees. Thinning generally occurs when forests are 10 to 30 years old, about the same time young regenerating forests are beginning to provide winter snowshoe hare habitat. "All thinning in lynx habitat would reduce winter snowshoe hare habitat which in turn would reduce snowshoe hare densities (Ruggerio et al. 2000, Griffin and Mills, in press)."

101.    In light of these well-known negative impacts to lynx and snowshoe hare habitat, the largest threat to lynx identified at the time of listing was the lack of guidance for conservation of lynx and snowshoe hare habitat on federal lands.

102.   In March 2007, the Forest Service adopted the NRLMD. The NRLMD was designed to "incorporate management direction in land management plans that conserves and promotes recovery of Canada lynx . . . while preserving the overall multiple-use direction in existing plans."

103.   The NRLMD set specific guidelines and standards for permitting activities that are determined to be "likely to have an adverse effect" on Canada lynx.

104.   The Flathead National Forest incorporated the NRLMD standards and guidelines into the 2018 Forest Plan.

105.   The Forest Plan adopts the NRLMD and its substantive directives "through standard FW-STD-WL-04, with proposed Forest-specific modifications to one guideline and the addition of one exception to a standard (*see* FW-GDL-REC-03 and FW-STD-TE&V-02)."

106.   The pertinent standards incorporated into the Forest Plan are as follows:

- Standard ALL S1 requires that new or expanded permanent development and vegetation management projects must maintain habitat connectivity in an LAU and/or linkage area.

- Standard VEG S1 states that unless a broad scale assessment has been completed that substantiates different historic levels of stand initiation structural stages, the Forest Service must limit disturbance in each LAU as follows: If more than 30 percent of the lynx habitat in an LAU is currently in a stand initiation structural stage that does not yet provide winter snowshoe hare habitat, no additional habitat may be regenerated by vegetation management projects.

- Standard VEG S2 requires that no more than 15 percent of lynx habitat on National Forest lands within any LAU be regenerated in a ten-year period.

107.   These standards were designed to "limit prescribed fire and timber harvest at the scale of an LAU" and "help provide an even flow of winter snowshoe hare habitat over time."

108.   However, the NRLMD allows exemptions to these standards for fuel treatment projects within the WUI "as defined by HFRA."

109.   In accordance with the 2013 Lynx Conservation Assessment and Strategy, the Forest Service identified and mapped the 109 LAUs on the Flathead National Forest. LAUs approximate the size of an area used by an individual lynx and encompass both potential lynx habitat and areas classified as non-lynx habitat.

110.   The Round Star Project includes portions of three LAUs: Evers Reid, Lost Tally, and Sheppard. These LAUs total 70,700 acres and are the area used to analyze direct, indirect, and cumulative impacts of the Project on Canada lynx.

111.   The Round Star Project will treat a total of 4,976 acres of mapped lynx habitat within the WUI. The EA states that the Project would affect approximately 5,114 acres of potential lynx forage habitat and 3,703 acres of potential denning habitat across the three LAUs.

112.   Additionally, the Round Star Project will add 17.6 miles of permanent road and 1.3 miles of temporary roads through lynx habitat, including 6.7 miles of roads

in potential lynx forage habitat and 8 miles in potential denning habitat.

113.   The Forest Service calculated that, accounting for past and proposed regeneration treatments (clearcutting), the Round Star Project area's LAUs would have experienced a total of 13.6% (Evers Reid) and 13% (Lost Tally) regenerative treatments in the past 10 years.

114.   This calculated percentage is under the 15% threshold required by the NRLMD and the Forest Plan; however, the Forest Service failed to consider all reasonably foreseeable actions occurring in Project LAUs when it calculated the percentage of each LAU that would experience regenerative treatments.

115.   For example, the Forest Service did not consider the Stillwater Unit of the Montana Department of Natural Resources and Conservation's ("DNRC") timber sale that has been proposed in the Project area, which will regenerate 399 acres of forest. Nor did it consider the massive forthcoming federal Cyclone Bill Project, which is discussed in more detail below. Both project boundaries contain lands within the Evers Reid LAU.

116.   In sum, because all reasonably foreseeable vegetation management projects that will affect the amount of habitat in regenerative stages across the LAUs in the Project area were not considered in determining the percentage of regenerated LAUs for the Project as required by the Forest Plan and the NRLMD, the Project violates NEPA and NFMA.

**Habitat Connectivity**

117.   The Round Star Project is within the Swift Creek-Stillwater connectivity area as identified by Squires et al. (2013).

118.   The Forest Service found in its Biological Assessment for the Forest Plan in 2017 that "NFS lands in the Swift Creek-Stillwater connectivity area [] provide habitat connectivity for wide-ranging wildlife species (e.g., grizzly bear, Canada lynx, elk) moving between the Whitefish and Salish Mountain Ranges (note: this incorporates a putative travel corridor identified in Squires and others (2013)."

119.   Fragmentation is a growing threat to wildlife worldwide and managers need solutions to reverse its impacts on species' populations. (Q024_KuennenWildlife ConnectivitySummary2017.pdf.)

120.   For example, connectivity between lynx habitat in Canada and the conterminous United States is facilitated by only a few putative corridors that extend south from the international border. The best available science has found that "[m]aintaining the integrity of these connectivity corridors is of primary importance to lynx conservation in the Northern Rockies."

121.   The EA states that the Round Star Project LAUs are "not in or near any of the putative corridors that connect lynx habitat in Canada with that in the northern Rockies of the United States (Squires et al. 2013)."

122.   However, this statement contradicts Squires et al. (2013), which shows

putative corridors very near the Project area. Figure 1-1 from the NRLMD EIS,

Appendix B, likewise shows the area as a lynx "linkage area" or "linkage zone," as

depicted on the map below with a double-sided arrow connecting the Glacier View

and Tally Lake ranger districts directly via the Round Star Project area:



123.   The Round Star EA notes that baseline connectivity of forested cover and

multistory lynx habitat is already "greatly limited" in the Sheppard LAU due to a

1997 wildland fire and "moderately limited" in the Evers Reid LAU due to areas of

low elevation and past logging.

124.   The EA admits that as a result of the Round Star Project, "[c]onnectivity

would be impacted by large openings[,] which lynx avoid." But despite

acknowledging that "[t]ravel patterns may change," the Forest Service insists that

"connectivity would still exist" and "[c]onnectivity of forested cover would not be severed by proposed vegetation treatments." Yet, the reality on the ground belies the agency's baseless conclusion. New treatment units largely fill in the gaps left by past clearcuts, leaving yet more scars on the landscape and significantly less mature forest cover to facilitate connectivity.

125.    The inconsistencies in the agency's connectivity analysis are arbitrary and capricious. Although the EA concludes that the Round Star Project's regeneration treatments will not limit connectivity in any LAUs, the Forest Service also states that past vegetation treatments have limited connectivity across the Project area.

126.    The Forest Service cannot have it both ways. By failing to explain or analyze these inconsistencies, the Forest Service has sidestepped an important issue and authorized the Round Star Project in violation of NEPA and NFMA.

127.    Such errors are even more egregious when considered alongside the Forest Service's failure to analyze the cumulative impacts of numerous other reasonably foreseeable, large logging projects that are in close proximity to the Project area.

**Other Logging Projects in the Project Area**

128.    The EA does not include anything resembling the following map of reasonably foreseeable actions so that the agency or the public could fully understand the scale, timeline, and/or proximity of other authorized or proposed logging projects to the Round Star Project's treatment units.



129. Specifically, at least seven current and/or future logging projects have been proposed and/or authorized in the Tally Lake Ranger District. The list of authorized and/or proposed logging projects includes but is not limited to: (1) Round Star; (2) Jack Knife; (3) Salish Good; (4) Cyclone Bill; (5) Stove Pipe; (6) Lemonade Salvage; and (7) Flathead Fuels. These projects contribute a total of roughly 41,863 acres of logging and burning and build a cumulative 100 miles of new roads. With the exception of Lemonade Salvage, which is isolated on the southwest of the ranger district, all share at least one border with another project.

130. Yet, the Round Star EA does not evaluate the cumulative effects of the Project in light of the vast and heavy logging that is currently occurring or will occur in the near future across the Tally Lake Ranger District.

131. For example, in January 2022, the Forest Service began developing a logging project immediately south of the Round Star Project area called Cyclone Bill. The Cyclone Bill Project proposes commercial logging on up to 9,192 acres and noncommercial vegetation treatments on up to 3,139 acres. To implement these vegetation management activities, approximately 11.9 miles of system road would be constructed, and 2.5 miles of temporary road would be constructed and rehabilitated after use.

132. In March 2023, the Forest Service initiated scoping for Cyclone Bill. In the scoping file, the Forest Service included a map that demonstrated overlap between

the LAUs in the Round Star and Cyclone Bill project areas. Both the Round Star and Cyclone Bill projects include portions of the Evers Reid and Lost Tally LAUs.

133.  Despite their overlapping timelines, the Final EA for the Round Star Project does not include any mention of Cyclone Bill. In fact, there is no mention of Cyclone Bill anywhere in the Project file, except for the ID Team Meeting notes that demonstrate Cyclone Bill and Round Star were developed at the same time.

134.  This reveals major problems with the agency's effects analyses across the EA—not least of which in the context of the Project's effects to Canada lynx because it follows that the Forest Service neither incorporated the impacts of the Cyclone Bill Project into its NEPA analysis, nor its calculation of regenerated LAUs under Forest Plan Vegetation Standard 2, which mandates that no more than 15% of an LAU may be regenerated in a 10-year period.

135.  The Round Star Project EA states that the Project will leave the Evers Reid LAU in about 14% regenerated status post-treatment. This is without considering Cyclone Bill's impacts to the regenerated condition of the Evers Reid LAU.

136.  But in the Cyclone Bill Draft EA, released November 2024, the Forest Service likewise claims that Cyclone Bill would leave 14% of the Evers Reid LAU in "unsuitable lynx condition" (i.e. regenerated status) post-treatment. In that EA, the Forest Service specifically notes that Cyclone Bill would take the Evers Reid LAU from 8% regenerated status to 14% regenerated status post-treatment.

137.  It simply cannot be the case that these two projects combined will result in the same amount of regenerated forest in the Evers Reid LAU as the Round Star Project alone.

138.  And as mentioned above, the Forest Service also failed to include DNRC and private logging projects in its calculation of regenerated forest cover.

139.  These omissions constitute a violation of NFMA because the Forest Service has failed to demonstrate consistency with the Forest Plan and NRLMD standards that prevent more than 15% of an LAU from being regenerated in a 10-year period.

140.  And it is especially concerning considering this highlights just one project out of a number of other reasonably foreseeable logging projects occurring in overlapping LAUs and/or LAUs immediately adjacent to the Project area.

141.  The EA is similarly flawed under NEPA because it does not adequately disclose, consider, or discuss how these other large and reasonably foreseeable logging projects may affect the ability of the Round Star Project area to provide habitat and maintain important connectivity for lynx and other wildlife.

**Grizzly Bears and Elk Security**

142.  Grizzly bears are a federally protected species under the ESA.

143.  Although no critical habitat has been designated for grizzly bears, the Round Star Project is located just west of the Northern Continental Divide Ecosystem ("NCDE") Recovery Zone, which is considered the "Primary Conservation Area"

for NCDE grizzly bears under the U.S. Fish and Wildlife Service's 1993 Grizzly Bear Recovery Plan ("Recovery Plan").

144.    Under the Recovery Plan, NCDE Zone 1, which is roughly a 10-mile buffer area around the Recovery Zone, is managed to support the continued occupancy of grizzly bears.

145.    Since 2012, there have been two documented denning events by adult females with offspring in the Salish demographic connectivity area just north of the Round Star Project analysis area.

146.    The Tally Lake Ranger District is within the Salish Mountain geographic area that encompasses the relatively gently sloped, rolling terrain of the Salish Mountain Range and includes most of the main Flathead River Valley. National Forest lands comprise 31 percent of the area, with most land in private or State ownership, including the Stillwater State Forest.

147.    Timber production and recreation are both historical and current "major uses" within the Salish Mountain geographic area.

148.    The Recovery Plan states, "Timber management programs may negatively affect grizzly bears by (1) removing thermal, resting, and security cover; (2) displacement from habitat during the logging period; and (3) increases in human/grizzly bear confrontation potential or disturbance factors as a result of road

building and management. New roads into formerly unroaded areas may cause bears to abandon the area."

149.  Recreation in the area includes hiking, hunting, mountain biking, motorized trail riding, horseback riding, snowmobiling, and skiing.

150.  The Round Star Project EA acknowledges that "[d]isturbance from proposed groomed Nordic ski trails and summer multiple use nonmotorized trails would be long-term and increasing over time." "Disturbance associated with human activity along trails . . . would also reduce the amount of habitat available for bear use."

151.  A wide network of roads currently exists to access private and Federal lands that have been managed primarily for timber production over the last several decades.

152.  The best available science establishes that roads likely pose the most imminent threat to grizzly bear habitat today, and the management of roads is one of the most powerful tools available to balance the needs of people with the needs of grizzly bears.

153.  Consistent with the Recovery Plan, the Forest Plan establishes the desired condition that within NCDE Zone 1 and the Salish demographic connectivity area, grizzly bear habitat should "contribute to sustaining [the] recovery of the grizzly bear population in the NCDE" as well as "provide[] habitat that can be used by

female grizzly bears and allows for bear movement between grizzly bear ecosystems." (GA-SM-DC-01.)

154.   Lands between the primary conservation area and the Salish demographic connectivity area, such as lands in the Swift Creek-Stillwater connectivity area, should be managed to "provide habitat connectivity for wide-ranging wildlife species (e.g. grizzly bear, Canada lynx, elk) moving between the Whitefish and Salish Mountain Ranges." (GA-SM-DC-03.)

155.   "Habitat security [should] contribute[] to [Montana Fish, Wildlife and Parks] objectives for big game populations, their distribution, and types of hunter access." (GA-SM-DC-05.)

156.   To achieve these desired conditions, Forest Plan Standard 1 (GA-SM-STD-01) requires that in "zone 1 *outside* the Salish demographic connectivity area, there shall be no net increase above the baseline in the density of roads open to public motorized use on NFS lands."

157.   "*Inside* the Salish demographic connectivity area, there shall be no net increase above the baseline in the density of roads and trails open to public motorized use during the non-denning season on NFS lands."

158.   "In order to provide elk habitat security," Forest Plan Guideline 1 (GA-SM-GDL-01) provides that "access management actions should not result in a decrease in total acres of NFS lands within the geographic area that are at least 250

contiguous acres and at least 0.5 mile from routes open to wheeled motorized use by the public during the hunting season."

159.   The Interagency Grizzly Bear Committee ("IGBC") has found that secure habitat (or "core areas"), which are areas free of motorized access, are an important component of grizzly bear survival and recovery.

160.   Secure habitat for the Project is defined as "areas greater than 500 meters from a gated road or a road or trail that is open to public wheeled motorized access." However, "Mace and Waller (1997) demonstrated an inverse relationship between road density and habitat selection, especially for female grizzly bears, even if roads are closed." *Swan View Coalition v. Haaland*, No. CV 22-96-M-DLC, at *32 (D. Mont. June 28, 2024).

161.   The Round Star Project EA acknowledges that "[a]cross the analysis area, a high density of open and closed roads facilitates human access, contributing to the risk of mortality or displacement of grizzlies."

162.   Yet, the Project authorizes constructing six miles of systematic and temporary roads through grizzly bear and elk secure habitat, increasing disturbance on 1,725 acres of cover for ungulates and 1,159 acres for grizzly bears, and reducing the effectiveness of the security areas for all wildlife.

163.   It will take at least 20 years for these units to start providing forage habitat and hiding cover again.

**Figure 2.** Proposed vegetation management units within elk security areas where cover will be reduced



164.   Approximately 1,490 acres qualify as old-growth forest on national forest lands within the analysis area for the Project. This is approximately 7% of the 21,980 acres of national forest land capable of producing coniferous forest in the analysis area.

165.   Forest Plan Timber Standard 7 (FW-STD-TIMB-07) limits the "maximum opening size created by clearcutting, seedtree cutting, shelterwood seed cutting, or other cuts designed to regenerate an even-aged stand of timber in a single harvest operation [to] 40 acres."

166.   The Round Star EA states that 36 units "alone or in combination exceed the 40 acres maximum opening size."

167.   Under the Forest Plan, exceptions to the 40-acre maximum opening size standard may only occur when the Forest Service has determined a larger opening is "necessary to help achieve desired ecological conditions for the plan area."

168.   But the Round Star Project EA does not explain why such large openings are "required to help achieve desired conditions," particularly considering the Forest Plan's stated desired conditions and the harm to wildlife caused by large openings.

169.   Rather, the EA summarily concludes that, although "[t]hese openings are known to have negative effects to wildlife and their ability to move through the landscape [they] were proposed to meet vegetation desired conditions."

170.   In addition, other well-known effects from roads and large openings are not adequately discussed in the EA. There is no discussion about how large openings and cover removal will impact elk displacement from public lands during hunting season, or how increased motorized access, including new roads leading into previously secure areas, will displace elk and grizzly bears, which is especially problematic because the agency admits that "disturbance [from new roads] would be ongoing for administrative use in perpetuity."

**Climate Impacts**

171.   The Forest Service did not include a discussion of climate impacts from the Round Star Project in the EA. To evaluate impacts to climate, the Forest Service tiered its "Forest Carbon Cycling Report" to the Forest Plan's programmatic

analysis across the entire Flathead National Forest.

172.    The Forest Carbon Cycling Report fails to consider the best available climate science and does not adequately analyze the Project's broader climate impacts; instead, the Report dismisses the carbon impacts of the project as "negligible" and contributing an "inconsequential effect on carbon cycling," without ever quantifying or explaining how much carbon the Round Star Project would release into the atmosphere.

173.    Specifically, the Report states, "[r]esults of actions in the Round Star project would have [a] negligible and infinitesimal effect to carbon sequestration in relation to the role the world's forests play in ameliorating climate change and indistinguishable from the effects of not taking the action."

174.    The Report concludes that "[t]he long term cumulative effects of forest management will have little impact overall on a potential future scenario of carbon accumulation and loss."

175.    However, the Forest Service does not quantify the carbon accumulation or loss from the project, nor does the Forest Service acknowledge that every additional bit of climate pollution or elimination of a forest's ability to sequester carbon makes the climate problem worse.

176.    Instead, the Forest Service throws up its proverbial hands and makes the unsubstantiated conclusion that "[o]nly very large scale, persistent changes are

strong enough to move the needle on carbon—even very large single disturbances don't do much at all. These trends incorporate dozens or perhaps hundreds of disturbances (natural and human made) over time and at a large scale."

177.   The Forest Service's approach does not adequately consider the Project's impacts on climate change.

## VI.   CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

*The Forest Service failed to take a hard look at the Project's impacts to wildlife and habitat connectivity, in violation of NEPA.*

178.   All previous paragraphs are incorporated by reference.

179.   NEPA and its implementing regulations require federal agencies, including the Forest Service, to take a "hard look" at the reasonably foreseeable environmental consequences of proposed actions and the reasonable alternatives that may avoid or minimize adverse impacts or enhance the quality of the human environment. *Earth Island Inst. v. United States Forest Serv.*, 351 F.3d 1291, 1300 (9th Cir. 2003); 42 U.S.C. § 4332(C)(i), (iii).

180.   Federal agencies must take a hard look at the direct, indirect, and cumulative effects or impacts of a proposed agency action and reasonable alternatives in an EA, 40 C.F.R. § 1508.1(g), (g)(4), including "any adverse environmental effects which cannot be avoided" if implemented, 42 U.S.C. § 4332(C)(ii).

181.   When several actions may have cumulative or synergistic environmental

impacts, the Forest Service must consider these actions together. *City of Tenakee Springs v. Clough*, 915 F.2d 1308, 1312 (9th Cir. 1990).

182.  The information in an EA must demonstrate "professional integrity, including scientific integrity," and the information upon which the agency relied and its limitations must be disclosed to the public. 42 U.S.C. § 4332(C)–(J).

183.  The Forest Service violated NEPA by failing to examine the impacts of the Round Star Project on wildlife in light of other reasonably foreseeable logging projects authorized and/or proposed across the Tally Lake Ranger District.

184.  Cumulatively, these projects total almost 42,000 acres of logging and burning and 100 miles of new road building in close proximity to the Round Star Project area, yet the impacts of these projects were not discussed in the EA.

185.  The EA entirely fails to discuss or attempt to quantify the cumulative effects of such drastic forest-wide habitat destruction to wildlife such as grizzly bears, Canada lynx, wolverine, bull trout, or their habitat and connectivity.

186.  Additionally, the EA fails to take a hard look at the Project's impacts to lynx and lynx habitat caused by the Project's expansion of the WUI beyond the boundaries analyzed in the Forest Plan EIS and the NRLMD.

187.  Moreover, the EA fails to adequately consider how large openings and removing significant cover will impact elk displacement from public lands during hunting season, or how increased motorized access into previously secure areas

will displace elk and grizzly bears, even if new roads are not open to the public.

188.    The Forest Service's analyses, actions, and omissions regarding the impacts of the Project to wildlife and to the connectivity of important wildlife habitat across the Project area violate NEPA and the APA.

## SECOND CLAIM FOR RELIEF

*The Forest Service's use of HFRA § 6591a(d) to authorize logging and burning in occupied lynx habitat violates HFRA, NEPA, and NFMA.*

189.    All previous paragraphs are incorporated by reference.

190.    HFRA directs the Forest Service to take action to reduce wildfire risk to "at-risk communities." 16 U.S.C. § 6511(1).

191.    Under exemptions in the NRLMD that were adopted by the Forest Plan, the Forest Service may treat winter lynx foraging habitat in the WUI for fuels reduction purposes, but the Forest Plan makes clear that in order to utilize the exemptions, treatments must be in the WUI "as defined by HFRA."

192.    The Project EA states that "[t]he acres planned for treatment that utilize these exemptions meet the wildland-urban interface definition as defined by the Healthy Forest Restoration Act."

193.    But the Round Star Project relies on an overinclusive WUI definition, in violation of HFRA, resulting in the Project authorizing more logging and burning in lynx habitat than permitted by the Forest Plan or contemplated by the NRLMD.

194.    In defining the WUI for the Project, the Forest Service claimed it was basing

the Project's WUI on Flathead County's similarly flawed community wildfire protection plans, and then arbitrarily decided it "would use [a] 1.5[-]mile buffer for the entire Forest as there are steep slope[s] [(greater than 30%)] in proximity to all communities."

195.  However, the agency did not identify any "at-risk communities" as defined by HFRA, and it boldly concluded without support that the "entire Forest" had "steep slope[s] in proximity to all communities" to justify imposing the wider 1.5-mile buffer from all structures across the entire Project area.

196.  Although HFRA permits logging in the WUI in order to protect people and property over other resource values, the Ninth Circuit has held that "reliance on a plainly overinclusive wildland-urban interface, without more, is the sort of 'clear error of judgment' that arbitrary or capricious review is meant to prevent." *All. for the Wild Rockies*, 2023 WL 5427921, at *11 (quoting *All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 494 (9th Cir. 2023)).

197.  And "[w]hile a community plan's definition of the wildland-urban interface need not parrot HFRA's, if a community plan's definition of its wildland-urban interface—on its face—deviates from HFRA and likely results in a covered area beyond what Congress authorized, the Forest Service cannot properly rely on the community plan—alone—to justify the categorical exclusion." *Id*. (internal quotations and alterations omitted).

198.   By relying on exemptions for areas in this overinclusive WUI, the Round Star Project will adversely affect lynx and lynx critical habitat by removing more acres of lynx habitat, displacing lynx from more areas during the Project, and altering the ability of lynx to use greater portions of the Project area for decades due to their avoidance of clearcuts and reliance on mature, multi-story forests.

199.   The full extent of such adverse impacts, however, is unknown because the Forest Service did not adequately consider the effects of expanding the WUI for the Project. The EA does not disclose the impacts to lynx that will result from removing significant portions of occupied lynx habitat from Forest Plan and NRLMD protections.

200.   Therefore, the Forest Service failed to take a hard look at the Project's impacts to lynx and lynx habitat because the Project-level WUI definition, mapping, and lynx-related impacts analyses that are improperly tiered to the Forest Plan EIS are misleading and inadequate, in violation of NEPA and NFMA.

201.   Also in violation of NFMA, the Forest Service has not demonstrated compliance with the Forest Plan's wildlife and vegetation standards for occupied lynx habitat. Because the Forest Service failed to consider the direct, indirect, and cumulative impacts from other reasonably foreseeable logging projects overlapping Project area LAUs, the EA fails to demonstrate the Project's consistency with Forest Plan and NRLMD standards that are designed to maintain

connectivity and prevent more than 15% of an LAU from being clearcut, or "regenerated," in a 10-year period.

202. In sum, the Forest Service's failure to demonstrate compliance with provisions of HFRA and the Forest Plan, as well as its failure to properly analyze the Project's impacts to lynx and adequately inform the public of the Project's impacts to lynx and lynx habitat, are violations of HFRA, NFMA, and NEPA, and render the Round Star Project's approval arbitrary and capricious, not in accordance with law, and without observance of procedures required by law, in violation of the APA.

### THIRD CLAIM FOR RELIEF

*The Forest Service has failed to demonstrate that the Round Star Project complies with Flathead National Forest Plan standards, in violation of NFMA.*

203. All previous paragraphs are incorporated by reference.

204. At the programmatic level, NFMA requires the Forest Service "develop, maintain, and, as appropriate, revise [forest plans] for units of the National Forest System." 16 U.S.C. § 1604(a). At the project level, NFMA requires each individual project to be consistent with the governing Forest Plan. § 1604(i).

205. Courts must "be able reasonably to ascertain from the record that the Forest Service is in compliance with [a Forest Plan] standard." *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 963 (9th Cir. 2005).

206.   As discussed above, the Round Star Project EA improperly tiers to the Forest Plan and fails to demonstrate compliance with the Forest Plan's wildlife and vegetation standards designed to maintain connectivity and mitigate adverse effects from logging in occupied lynx habitat.

207.   Additionally, the Round Star Project fails to demonstrate compliance with the Forest Plan because the Decision authorizes road building into secure habitat and clearcutting that will result in openings of over 40 acres without demonstrating that they are "required to help achieve desired conditions," despite the clear harm caused to wildlife and maintaining connectivity among important wildlife habitats.

208.   The Forest Service's failure to demonstrate compliance with multiple provisions of the Forest Plan is a violation of NFMA, and thus the agency's Decision to authorize the Round Star Project is arbitrary and capricious in violation of the APA.

## FOURTH CLAIM FOR RELIEF

*The Round Star Project violates NEPA because
it fails to take a hard look at climate impacts.*

209.   All previous paragraphs are incorporated by reference.

210.   NEPA requires federal agencies, including the Forest Service, to take a "hard look" at the direct, indirect, and cumulative impacts of proposed major federal actions. *Earth Island Inst.*, 351 F.3d at 1300; 40 C.F.R. § 1508.1(g).

211.   Among the impacts NEPA requires agencies to disclose are climate impacts.

*Ctr. for Biological Diversity v. U.S. Forest Serv.*, 687 F. Supp. 3d 1053, 1073–77 (D. Mont. 2023) ("[W]hile the [Forest Service] did address climate change in its review, merely discussing carbon impacts and concluding that they will be minor does not equate to a "hard look.").

212.  Here, the Forest Service likewise failed to adequately discuss or disclose the climate change impacts of the Round Star Project on carbon storage, sequestration, or the Project's impacts to global climate change.

213.  The Forest Service also failed to discuss any climate pollution impacts of Project implementation—the use of fossil fuel engines to build roads, cut trees, and remove and transport cut logs to mills—compared to the no action alternative.

214.  Rather than conducting an analysis of the Round Star Project's climate impacts, the Forest Service summarily concluded that "[o]nly very large scale, persistent changes are strong enough to move the needle on carbon—even very large single disturbances don't do much at all."

215.  As the Ninth Circuit found in *350 Montana v. Haaland*, an agency's cookie-cutter claim that a project's climate impacts will be minor based on "an opaque comparison to total global emissions" is insufficient. 50 F.4th 1254, 1269–70 (9th Cir. 2022).

216.  Therefore, the Forest Service failed to take a "hard look" at the Round Star Project's climate pollution impacts, in violation of NEPA, and the Forest Service's

decision to approve the Project is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the APA.

## VIII.  RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in its favor and against Defendants and provide the following relief:

A.    Declare that the Project, as approved, violates the law;

B.    Vacate the Project decision and remand the matter to the agency until such time as the agency demonstrates to this Court that it has adequately complied with the law;

C.    Set aside the Project Decision Notice and Finding of No Significant Impact;

D.    Enjoin implementation of the Project;

E.    Award Plaintiffs the costs, expenses, expert witness fees, and reasonable attorney fees as authorized by the Equal Access to Justice Act, 28 U.S.C. § 2412(d), and any other applicable provisions; and

F.    Grant Plaintiffs other such relief this Court deems just and proper.

Respectfully submitted this 8th day of January, 2025.

*/s/ Alizabeth A. Bronsdon*
BRONSDON LAW FIRM, PLLC

Oliver Wood
OLIVER WOOD LAW, PLLC

*Attorneys for Plaintiffs*