IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES, NATIVE ECOSYSTEMS COUNCIL, COUNCIL ON WILDLIFE AND FISH, and YELLOWSTONE TO UINTAS CONNECTION, | CV 25–5–M–KLD |
| Plaintiffs, | ORDER |
| vs. | |
| WILLIAM MULHOLLAND, in his official capacity as Tally Lake District Ranger, Flathead National Forest; UNITED STATES FOREST SERVICE; and UNITED STATES FISH AND WILDLIFE SERVICE | |
| Defendants, | |
| and | |
| AMERICAN FOREST RESOURCE COUNCIL, | |
| Defendant-Intervenor. | |

Plaintiffs Alliance for the Wild Rockies, Native Ecosystems Council,

Council on Wildlife and Fish, and Yellowstone to Uintas Connection move for a

preliminary injunction to enjoin activities authorized by the Round Star Vegetation

Management Project ("Project") on the Flathead National Forest. Because

1

Plaintiffs have not raised serious questions going to the merits, the motion is denied.

## I.    Background

Plaintiffs filed this lawsuit against William Mulholland, the United States Forest Service ("USFS"), and the United States Fish and Wildlife Service ("FWS") (collectively "Federal Defendants") on January 8, 2025. (Doc. 1). On May 14, 2025, this Court granted a motion to intervene, filed by Defendant-Intervenors American Forest Resource Council. (Doc. 20). On May 14, 2025, this Court granted Plaintiffs' motion (Doc. 19) to file an amended complaint. Plaintiffs filed the amended complaint on May 13, 2025. (Doc. 24). The amended complaint alleges violations of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*; the National Environmental Policy Act, 42 U.S.C. §§ 4431 *et seq.*; the National Forest Management Act, 16 U.S.C. §§ 1600 *et seq.*; the Healthy Forest Restoration Act, 16 U.S.C. §§ 6591 *et seq.*; and the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-44. (Doc. 24 at 2). Plaintiffs' claims are brought under the APA. (Doc. 24 at 2).

The Project was authorized on April 3, 2024, by Defendant William Mulholland, the USFS Tally Lake District Ranger. (FS004706). The Project area consists of 28,300 acres in Flathead County, Montana and is located approximately 13 miles west of the city of Whitefish. (FS004683). The federally owned lands in

the Project area fall within the Tally Lake Ranger District of the Flathead National

Forest (FS004683). These National Forest lands comprise 78 percent of the Project

area. State lands comprise seven percent and privately owned lands comprise the

remaining 15 percent. (FS004683). The Decision Notice for the Project notes that

92 percent of the Project area falls within the wildland-urban interface, as

designated in the 2011 and 2020 Flathead County Community Wildfire Protection

Plans. (FS004683).

The Project itself involves a range of vegetation management components

across 9,151 acres of National Forest in the Project area, including commercial and

noncommercial treatments. (FS004684). Authorized noncommercial treatments

total 2,827 acres and include forest thinning and prescribed fire. Commercial

treatments total 6,324 acres, including 580 acres of clearcut. (FS004684). The

Project also authorizes the construction of 3.4 miles of temporary roads and 18.7

miles of permanent National Forest System roads. (FS004684). The Project further

includes recreational improvements at the Round Meadow trailhead. (FS004684).

The Project area contains habitat for grizzly bear, a threatened species under

the ESA. (FS012146). The Project area overlaps with Zone 1 of the Northern

Continental Divide Ecosystem Grizzly Bear Recovery Zone as well as a portion of

Salish Demographic Connectivity Area. (FS011899).

Pursuant to Section 7 of the ESA, USFS engaged in consultation with FWS

on the effects of the Project on grizzly bear and other ESA-listed species. The
Biological Opinion for the Project was issued in December 2023. FWS concluded
that the effects of the Project "are *not likely to jeopardize the continued existence
of the grizzly bear.*" (FS012167) (emphasis in original).

On June 6, 2025, Plaintiffs filed the instant motion for preliminary
injunction. (Doc. 33). Oral argument was held on July 11, 2025, in Missoula,
Montana. At oral argument, Plaintiffs indicated that the injunctive relief they are
seeking is more limited than what was initially requested in their motion and
accompanying brief. Plaintiffs seek a preliminary injunction to halt Project
activities, excluding those involved in the GNA Roundstar Timber Sale, the Hairy
Pumpkin Timber Sale, and the Roundski Timber Sale as well as any other Project
activities that have already occurred.

## II.  Legal Standards

"A preliminary injunction is an extraordinary remedy never awarded as of
right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain
a preliminary injunction, a plaintiff must establish four elements: (1) a likelihood
of success on the merits, (2) a likelihood of irreparable harm in the absence of an
injunction, (3) that the balance of equities tips in the plaintiff's favor, and (4) that
the injunction is in the public interest. *Winter*, 555 U.S. at 20. While the likelihood
of success on the merits is the most important factor, *Disney Enterprises, Inc. v.*

*VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017), a plaintiff "must satisfy all four *Winter* prongs in order to secure an injunction." *Cottonwood Envtl. L. Ctr. v. U.S. Sheep Experiment Station*, No. CV 17-155-M-DLC, 2019 WL 3290994 at *1 (D. Mont. July 22, 2019) (citing *Alliance of the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)). The party seeking the injunction bears the burden of proving these elements. *Klein v. City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009).

The Ninth Circuit has adopted a "sliding scale approach to preliminary injunctions" whereby "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Cottrell*, 632 F.3d at 1131. The Ninth Circuit recognizes one such "approach under which a preliminary injunction could issue where the likelihood of success is such that serious questions going to the merits were raised and the balance of hardships tips sharply in plaintiff's favor." *Cottrell*, 632 F.3d at 1131 (citations and internal quotation marks omitted). As to the first *Winter* factor, "the serious questions standard is 'a lesser showing than likelihood of success on the merits.'" *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1190 (9th Cir. 2024) (quoting *Alliance for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017)).

The test for a preliminary injunction is modified in cases where claims are

brought pursuant to the ESA. "[W]hen applying the 'serious questions' test to ESA claims, the last two factors—balance of hardships and the public interest—always '[tip] heavily in favor of protected species'" *Flathead-Lolo-Bitterroot Citizen Task Force*, 98 F.4th at 1190 (quoting *Natl. Wildlife Fedn. v. Burlington N. R.R., Inc.,* 23 F.3d 1508, 1511 (9th Cir. 1994)). Accordingly, a court considering ESA claims on a motion for preliminary injunction need only consider (1) the likelihood of success on the merits or whether the plaintiff has raised serious questions, and (2) the likelihood of irreparable harm in the absence of an injunction. *Flathead-Lolo-Bitterroot Citizen Task Force*, 98 F.4th at 1190. If a plaintiff fails to establish a likelihood of success on the merits or a serious question, the court "need not examine the three remaining *Winter* factors." *Doe v. Reed*, 586 F.3d 671, 681 n.14 (9th Cir. 2009).

A court's review of a federal agency's biological opinion is governed by the APA. *Natl. Wildlife Fedn. v. Natl. Marine Fisheries Serv.*, 839 F. Supp. 2d 1117, 1124–25 (D. Or. 2011) (citing *Bennett v. Spear,* 520 U.S. 154, 174–77, (1997)). Pursuant to the APA, courts are required to uphold agency actions unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[,]" or "without observance of procedure required by law." *Center for Biological Diversity*, 868 F.3d at 1057; 5 U.S.C. § 706(2)(A); 5 U.S.C. § 706(2)(D).

The APA standard of review is deferential. A decision is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

An agency action likewise is arbitrary and capricious if the agency fails to articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made. *Motor Vehicle Mfrs.*, 463 U.S. at 43. A court may not accept an agency's post hoc rationalizations for its action. *Motor Vehicle Mfrs.*, 463 U.S. at 50. "It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs.*, 463 U.S. at 50.

## III.    Discussion

### A.    Irreparable Harm

To obtain a preliminary injunction "plaintiffs must establish that irreparable harm is *likely*, not just possible . . . ." *Cottrell,* 632 F.3d at 1128 (citing *Winter*, 555 U.S. at 22 (2008)). However, "establishing irreparable injury should not be an onerous task for plaintiffs" *Cottonwood Envtl. L. Ctr. V. U.S. Forest Service,* 789

7

F.3d 1075, 1091 (9th Cir. 2015). "Indeed, Plaintiffs' expressed desire to visit the area in an undisturbed state is all that is required to sufficiently allege harm under the ESA." *Alliance for Wild Rockies v. Marten*, 253 F. Supp. 3d 1108, 1111 (citing *Cottrell*, 632 F.3d at 1135).

Here, Plaintiffs argue that they will be irreparably harmed "in the absence of preliminary relief . . . ." (Doc. 34 at 15). In an affidavit attached to Plaintiffs' motion for injunctive relief, Steve Kelly—member of Plaintiff Alliance for the Wild Rockies and Executive Director of Plaintiff Council on Wildlife and Fish—declared:

> Project activities like logging, precommercial thinning, and road building will negatively impact grizzly bears and mature old growth dependent species like the pileated woodpecker and Canada lynx. When I go to the Project area, I go with the hopes of seeing these species. The Project will reduce the habitat for these species, which will lessen my ability to view them . . . .

(Doc. 34-1 at ¶ 10).

Ordinarily, Plaintiffs' allegations would satisfy the irreparable prong harm of the *Winter* analysis. However, Plaintiffs motion for a preliminary injunction was filed well over a year after the Decision Notice was signed for the Project. Indeed, several timber sales authorized by the Project were well underway by the date of oral argument on the instant motion.

This delay weighs against a finding of irreparable harm, particularly given the ongoing timber sales. "As this Court has repeatedly and consistently explained,

a delay of even a few months is a significant delay in the life of a timber sale operation." *Native Ecosystems Council v. Webber*, No. CV 25-25-M-DLC, 2025 WL 1643100, at *7 (D. Mont. June 10, 2025) (citing *Yellowstone to Uintas Connection v. Marten,* No. CV 24-25-M-DLC, 2024 WL 3400524 at *6 (D. Mont. July 12, 2024)); *Helena Hunters and Anglers Ass'n v. Marten*, No. CV 19-106-M-DLC, 2019 WL 5069002, at *2 (D. Mont. Oct. 9, 2019).

The legal effect of Plaintiffs delay is somewhat minimized by Plaintiffs' stipulation at oral argument that they now to seek to enjoin only those Project activities that have not yet commenced. Nevertheless, Plaintiffs do not present a satisfactory explanation for the months that elapsed between approval of the project, the initiation of this lawsuit, and the filing of Plaintiffs' motion for a preliminary injunction.

Although it works against Plaintiffs' request, delay alone is insufficient to deny Plaintiffs' motion for a preliminary injunction. *Helena Hunters and Anglers Assn.,* 2019 WL 5069002, at *2 (D. Mont. Oct. 9, 2019). Therefore, the Court moves on to the remaining *Winter* factor.

## B.    Success on the Merits

Plaintiffs make two primary arguments regarding the merits of its case. Both concern alleged procedural violations of the ESA. First, Plaintiffs argue FWS failed to adequately address cumulative impacts to grizzly bears in the Biological

Opinion. Second, Plaintiffs argue FWS failed to use the best available science in the Biological Opinion.

### i.    Cumulative Effects

Plaintiffs claim FWS failed to conduct a lawful cumulative effects analysis in the ESA consultation for grizzly bears because the agency did not analyze state and private activities that are reasonably certain to occur in the Project area. (Doc. 34 at 25).

Forest Service actions, such as the Project, must comply with the ESA. Congress enacted the ESA to protect and conserve endangered and threatened species and the ecosystems they depend upon. 16 U.S.C. § 1531(b). The Supreme Court has deemed the ESA "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 180 (1978). The hallmark of the ESA is its solemn resolve that endangered species "be afforded the highest of priorities" with the goal to "halt and reverse the trend toward species extinction, whatever the cost." *Tennessee Valley Authority*, 437 U.S. at 174, 184.

The ESA and its implementing regulations require agencies proposing actions to engage in consultation with FWS to ensure the action "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species . . . ."

16 U.S.C. § 1536(a)(2). To effectuate consultation, the ESA requires action agencies to "conduct a biological assessment for the purpose of identifying any endangered species or threatened species which is likely to be affected by such action." 16 U.S.C. §1536(c)(1); 50 C.F.R. § 402.12(a). The contents of a biological assessment are at the discretion of the Forest Service and may include "consideration of cumulative effects." 50 C.F.R. § 402.12(f)(4).

After consultation is completed between the FWS and the action agency, the FWS will issue a biological opinion "detailing how the agency action affects the species or its critical habitat. If jeopardy or adverse modification is found, the [FWS] shall suggest" reasonable and prudent alternatives the action agency can employ in implementing the proposed action. 16 U.S.C. § 1536(b)(3)(A).

Implementing regulations dictate the preparation and contents of the biological opinion prepared by FWS. In formal consultation, the agency must "[e]valuate the current status and environmental baseline of the listed species" and "[e]valuate the effects of the action and cumulative effects on the listed species . . . ." 50 C.F.R. § 402.14. For purposes of the ESA, cumulative effects "are those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." 50 C.F.R. § 402.02. FWS must then "[a]dd the effects of the action and cumulative effects to the environmental baseline and in light of the status of

the species and critical habitat, formulate [FWS'] opinion as to whether the action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.14.

Plaintiffs assert that the agencies' cumulative effects analysis is deficient because the Biological Assessment and Biological Opinion do not disclose the overall density of roads in the Project area. (Doc. 34 at 27-28). As Plaintiffs point out, grizzly bear are adversely impacted by the presence of roads, which may displace them from their habitat and affect their movement across the landscape. (Doc. 34 at 9, 27). Accordingly, Plaintiffs argue that the cumulative effects analysis should take into account road densities across the entire Project area, including on non-federal land. "The agencies do not disclose the actual open road and motorized trail density that exists and will be experienced by grizzly bears across the entire action area, including on state and private lands." (Doc. 34 at 28).

In support of their arguments, Plaintiffs largely rely on this Court's decisions in *Alliance for the Wild Rockies v. Gassmann.* 678 F. Supp. 3d 1249 (D. Mont. 2023). In that case, this Court considered similar facts and argument on summary judgment. There, the plaintiffs challenged the cumulative effects analysis of an analogous USFS project, and alleged that during the consultation process the agencies failed to consider "the presence of roads on state or private land and how they may increase the road density actually experienced by grizzly bears in the

12

Project area." This Court found that the agencies' failure to analyze state and private roads across the project area violated the ESA. *Gassmann,* 678 F. Supp. 3d at 1281-83.

Plaintiffs argue that the facts at hand—namely the analysis concerning roads on non-federal lands throughout the Project area—mirror those in *Gassmann*. However, *Gassmann* is distinguishable from the situation at hand. The holding in that case depended in part on how the agencies justified (or attempted to justify) the decision to omit any analysis regarding roads and secure habitat on non-federal lands. To explain the lack of analysis, the defendants in *Gassmann* offered that the decision to omit the non-federal roads analysis was part of an overly conservative assumption. Instead of actually analyzing roads and grizzly bear secure habitat on non-federal lands, defendants argued that they had intentionally assumed there was none. Yet, that conclusion conflicted directly with other portions of the administrative record which highlighted the existence and significance of secure habitat and roadless areas on non-federal land. *Gassmann,* 678 F. Supp. 3d at 1281-83.

In contrast, the facts here point to no such demonstrably false assumption, nor evidence that Federal Defendants are offering an analogous, post-hoc rationalization. Further, the record in *Gassmann* indicated that, not only was there secure habitat on non-federal land, that secure habitat was frequently used and

even preferred by grizzly bear in the project area. 678 F. Supp. 3d at 1282. Here, there is no indication that any secure habitat on non-federal land in the Project area is of a similar significance. Indeed, the administrative record indicates the Project area is subject to widespread development, and largely falls within the wildland-urban interface. (FS004683).

In essence, Plaintiffs argue *Gassmann* stands for the proposition that a cumulative effects analysis for grizzly bear must include a quantitative analysis of road density, including all on non-federal lands across the Project area. Although the cumulative effects analysis in that case was deficient under the ESA, Plaintiffs' arguments concerning the matter at hand go beyond its holding.

Considering FWS' cumulative effects analysis in the broader context of the facts contained in the administrative record, it is clear that FWS sufficiently addressed the likely effects of roads on grizzly bear. For instance, the cumulative effects analysis includes descriptions of a state timber sale that will require road use. (FS012165). Similarly, the Biological Assessment (incorporated by into the Biological Opinion by reference) includes additional consideration of roads on non-federal lands. (FS012069.) Accordingly, the Court finds that Plaintiffs have failed to raise a substantial question going to the merits of their claim that the Project cumulative effects analysis is fatally deficient.

ii.    **Best Available Science**

Plaintiffs next claim that the Project Biological Opinion fails to use the best available science, in violation of the ESA. (Doc. 34 at 34). Plaintiffs challenge both the alleged omission of data concerning road densities as well as FWS' alleged reliance on a 2014 study regarding grizzly bear populations and road density.

Under the ESA, consulting agencies must use "the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g). A failure to do so is arbitrary and capricious, and a violation of the APA. *San Luis & Delta–Mendota Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014). In determining what constitutes the best available science, agencies are entitled to significant deference. "The determination of what constitutes the '*best* scientific data available' belongs to the agency's 'special expertise.... When examining this kind of scientific determination, as opposed to simple findings of fact, a reviewing court must generally be at its most deferential.'" *San Luis & Delta–Mendota Water Auth. v. Jewell*, 747 F.3d at 602 (quoting *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 103, (1983)).

The scope of the ESA's best available science requirement is limited and "merely prohibits [an agency] from disregarding available scientific evidence that is in some way better than the evidence [it] relies on." *Kern Cnty. Farm Bureau*, 450 F.3d 1072, 1080 (9th Cir. 2006) (quoting *Sw. Ctr. for Biological Diversity v.*

15

*Babbitt,* 215 F.3d 58, 60 (D.C. Cir.2000)). "Mere disagreement" with the

conclusions reached by an agency in preparing a biological opinion does not

substantiate a violation of the requirement. *Cascadia Wildlands v. Thrailkill*, 806

F.3d 1234, 1241 (9th Cir. 2015) (citing *United States v. Lewis,* 611 F.3d 1172,

1180 (9th Cir.2010)). "This standard does not require the agency to 'conduct new

tests or make decisions on data that does not yet exist.'" *Ctr. for Biological*

*Diversity v. U.S. Fish & Wildlife Serv.*, 807 F.3d 1031, 1047 (9th Cir. 2015)

(quoting *San Luis & Delta–Mendota Water Authority v. Locke,* 776 F.3d at 996).

Here, Plaintiffs argue FWS failed to rely on the best available science in

preparing the Project Biological Opinion. Plaintiffs' argument comes in two parts.

First, Plaintiffs challenge FWS' decision not to include certain roads in the

cumulative effects analysis. "At a minimum, quantifying the road density as

experienced by grizzly bears, including both open and total roads across all land

ownership in the action area, is critical to any meaningful cumulative effects

analysis." (Doc. 34 at 31). Plaintiffs' challenge is apparently limited to the

omission of data concerning state and private lands that inform the cumulative

effects analysis in the Project Biological Opinion.[1]

---

[1] "In summary, the [Biological Opinion] for grizzly bears violates the ESA because
it fails to use the best available science and fails to account for state and private
roads in the road density and secure habitat analyses." (Doc. 34 at 33).

Plaintiffs' argument on this point appears to rehash issues presented in their claim regarding the overall sufficiency of FWS' cumulative effects analysis. Assuming it is necessary to revisit whether FWS should have included data concerning roads on non-federal lands in the Project area, Plaintiffs arguments again fail.

In response to Plaintiffs' assertion, Federal Defendants and Defendant-Intervenors (collectively "Defendants") indicate the data that would satisfy Plaintiffs' demand is unavailable.[2] In their reply brief, Plaintiffs invoke *Gassmann* for the proposition that agencies have an affirmative duty to seek out and obtain all data relevant to the decision at hand. (Doc. 41 at 12) (citing *Gassmann,* 678 F. Supp. 3d at 1283). Plaintiffs request would therefore require the agencies to seek out information that is currently unavailable. Such a requirement would contravene established Ninth Circuit precedent limiting what an agency must obtain and consider. *See Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 807 F.3d at 1047. Accordingly, there is no basis for the court to prescribe that FWS must include a quantitative analysis of roads on non-federal lands in the cumulative

---

[2] Defendants cite to the 2020 Conservation Strategy for the Grizzly Bear in the Northern Continental Divide Ecosystem, included as part of the administrative record. (Doc. 38-1 at 25). "However, Zone 1 and the DCAs are characterized by a larger proportion of private land, where road information is incomplete or unavailable." (FWS001559). As above, the Project Area overlaps with the NCDE Zone 1 and Salish Demographic Connectivity Area.

effects section of the Biological Opinion.

Second, Plaintiffs challenge the Biological Opinion's application of the Boulanger and Stenhouse (2014) study. Plaintiffs allege "[t]he Project [Biological Opinion] purports to rely on Boulanger and Stenhouse when it represents that 2.0 miles per square mile is an appropriate road limit for female grizzly bears for legal open roads." (Doc. 34 at 31).

The Boulanger and Stenhouse (2014) study is referenced several times throughout the Biological Opinion. (FS012147; FS012153; FS012154). However, Plaintiffs challenge apparently lies with FWS' mention of the study on a single page in the Environmental Baseline section of the Biological Opinion.

> *Density of Open Motorized Routes.* Motorized routes have long been recognized as a major factor affecting grizzly bears. The BA states that the Project area has an open linear motorized route density of 1.7 miles per square mile, which is below the threshold identified by Boulanger and Stenhouse (2014) of 2.0 miles per square mile or less to support female occupancy. The Forest Plan species that The Forest Plan specifies that density is to be calculated as the miles of National Forest System roads and trails open to public motorized use during the non-denning season, divided by the total square miles of NFS lands in the same area.

(FS012147).

Plaintiffs argue that Boulanger and Stenhouse (2014) is misapplied because the study was based on total roads across a landscape, rather than "legally open roads." (Doc. 34 at 31). Plaintiffs insist that "[w]ithout evidence in the administrative record to draw a connection between the chosen standard and the

18

analysis," FWS has violated the ESA. (Doc. 34 at 32).

In response, Defendants explain a rationale for applying the Boulanger and Stenhouse (2014) to the analysis of the Project area. Specifically, Defendants point to similarities between the data that informed the study and the conditions on the ground in the Project area. (Doc. 38-1 at 27). The determination of how to apply to study is itself a matter of scientific and technical expertise. *See San Luis & Delta–Mendota Water Auth. v. Jewell*, 747 F.3d at 602. It is not the province of the Court to second guess such a determination. Accordingly, Plaintiffs' arguments on this issue are unpersuasive.

Plaintiffs further argue FWS extracted and applied the wrong standard from the study. Specifically, Plaintiffs aver that "if the goal is a viable population, the road density limit is not 2.0 miles per square mile but a maximum 1.2 miles per square mile." (Doc. 34 at 31-32) (citing FS013248). According to Plaintiffs, this discrepancy is significant because the Salish Demographic Connectivity Area, which overlies a portion of the Project, should be managed "to ensure a viable population of female grizzly bears that can connect to other imperiled grizzly populations . . . ." (Doc. 34 at 32) (citing FS000437). Accordingly, Plaintiffs assert, any density over 1.2 miles per square mile can be "construed as obstructing grizzly connectivity in this critical area." (Doc. 34 at 32).

As above, the interpretation and application of Boulanger and Stenhouse

(2014) is best left to the agencies. Further, Defendants convincingly demonstrate the applicability and appropriateness of the 2.0 miles per square mile standard in the Salish Demographic Connectivity Area. (Doc. 40 at 32-33; Doc. 38-1 at 29). Significantly, Defendants point to the Revised Biological Opinion on the Revised Forest Plan for the Flathead National Forest. (Doc. 40 at 31). There, FWS applied the 2.0 miles per square mile standard from Boulanger and Stenhouse (2014) as a threshold to "evaluate the ability of the Salish demographic connectivity area to support occupancy and movement by female grizzly bears." (FS004110, Table III-16).

The reference to the Boulanger and Stenhouse (2014) standard in the Project Biological Opinion should be read not as standard which USFS must meet as it implements the Project. Rather, the reference occurs in the environmental baseline analysis. In this context, "environmental baseline" refers to

> [T]he condition of the listed species or its designated critical habitat in the action area, without the consequences to the listed species or designated critical habitat caused by the proposed action. The environmental baseline includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process.

50 C.F.R. § 402.02. Accordingly—and taking to account the information in the Revised Forest Plan Biological Opinion—the challenged reference to the 2.0 miles

per square standard is merely indicating that the road density across federal lands in the Project area currently falls below a threshold that was previously deemed appropriate. Accordingly, Plaintiffs' arguments on this issue cannot sustain serious questions going to the merits of the claim that the Biological Opinion was deficient under the ESA.

In sum, neither of the issues that Plaintiffs have argued rise to the level of serious question going to the merits of their case. Nor have plaintiffs met the greater burden of showing a likelihood of success on the merits.

## IV. Conclusion

For the reasons discussed above, the Court concludes that Plaintiffs have not raised serious questions going to the merits of their case. The failure to satisfy this element of the *Winter* test is sufficient to deny Plaintiffs' request. *See Disney*, 869 F.3d at 856 (if the plaintiff fails to establish a likelihood of success prong, the court need not consider the other *Winter* factors). Accordingly,

IT IS ORDERED that Plaintiffs' motion for a preliminary injunction (Doc. 33) is DENIED.

DATED this 22nd day of July, 2025.

Kathleen L. DeSoto
United States Magistrate Judge