IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES, NATIVE ECOSYSTEMS COUNCIL, COUNCIL ON WILDLIFE AND FISH, and YELLOWSTONE TO UINTAS CONNECTION, | CV 25–5–M–KLD |
| Plaintiffs, | |
| vs. | ORDER |
| WILLIAM MULHOLLAND, in his official capacity as Tally Lake District Ranger, Flathead National Forest; UNITED STATES FOREST SERVICE; and UNITED STATES FISH AND WILDLIFE SERVICE | |
| Defendants, | |
| and | |
| AMERICAN FOREST RESOURCE COUNCIL, and MONTANA DEPARTMENT OF NATURAL RESOURCES AND CONSERVATION | |
| Defendant-Intervenors. | |

Plaintiffs Alliance for the Wild Rockies, Native Ecosystems Council,

Council on Wildlife and Fish, and Yellowstone to Uintas Connection bring this

1

action against William Mulholland, the United States Forest Service ("USFS"),

and the United States Fish and Wildlife Service ("FWS") (collectively "Federal

Defendants"), challenging the approval of the Round Star Vegetation Management

Project ("Project") on the Flathead National Forest. Plaintiffs' amended complaint

alleges violations of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701

*et seq.*; the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4431 *et*

*seq.*; the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600 *et seq.*;

the Healthy Forest Restoration Act ("HFRA"), 16 U.S.C. §§ 6591 *et seq.*; and the

Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-44. (Doc. 24 at 2). Plaintiffs'

claims are brought under the APA. (Doc. 24 at 2).

This matter comes before the Court now on Plaintiffs' motion for summary

judgment (Doc. 63), Federal Defendants' cross-motion for summary judgment

(Doc. 67), and cross-motions for summary judgment by Defendant-Intervenors

American Forest Resource Council ("AFRC") (Doc. 72) and State of Montana

Department of Natural Resources and Conservation ("DNRC") (Doc. 75). The

Court heard oral argument on the pending motions on March 3, 2026. The parties'

cross-motions for summary judgment are granted in part and denied as set forth

below.

## I.    Background

The Project was authorized on April 3, 2024, by Defendant William

Mulholland, the USFS Tally Lake District Ranger. (FS004706). The Project area consists of 28,300 acres in Flathead County, Montana and is located approximately 13 miles west of the city of Whitefish. (FS004683). The federally owned lands in the Project area fall within the Tally Lake Ranger District of the Flathead National Forest (FS004683). These National Forest lands comprise 78 percent of the Project area. State lands comprise seven percent and privately owned lands comprise the remaining 15 percent. (FS004683). The Decision Notice for the Project notes that 92 percent of the Project area falls "within the wildland-urban interface . . . as designated in the 2011 and 2020 Flathead County Community Wildfire Protection Plans." (FS004683).

The Project includes a range of vegetation management components across 9,151 acres of National Forest in the Project area, including commercial and noncommercial treatments. (FS004684). Authorized noncommercial treatments total 2,827 acres and include forest thinning and prescribed fire. Commercial treatments total 6,324 acres, including 580 acres of clearcut. (FS004684). The Project also authorizes the construction of 3.4 miles of temporary roads and 18.7 miles of permanent National Forest System roads. (FS004684). The Project further includes recreational improvements at the Round Meadow trailhead. (FS004684).

The Project area contains habitat for grizzly bear, a threatened species under the ESA. (FS012146). The Project area overlaps with Zone 1 of the Northern

Continental Divide Ecosystem Grizzly Bear Recovery Zone as well as a portion of Salish Demographic Connectivity Area. (FS011899). The Project also contains habitat for Canada Lynx, another threatened species under the ESA. (FS012134). The Project area overlaps with the Sheppard, Evers Reid, Lost Tally, and Lower Good Lynx Analysis Units. (FS012134).

Pursuant to Section 7 of the ESA, USFS engaged in consultation with FWS on the effects of the Project on grizzly bear, Canada Lynx, and other ESA-listed species. The Biological Opinion for the Project was issued in December 2023. FWS concluded that the effects of the Project "are *not likely to jeopardize the continued existence of the grizzly bear.*" (FWS000036) (emphasis in original). Similarly, FWS concluded that the Project "*is not likely to jeopardize the continued existence of lynx.*" (FWS000005) (emphasis in original).

Plaintiffs filed this lawsuit on January 8, 2025. (Doc. 1). On May 14, 2025, this Court granted a motion to intervene, filed by Defendant-Intervenors ARRC. (Doc. 20). On May 14, 2025, this Court granted Plaintiffs' motion (Doc. 19) to file an amended complaint. Plaintiffs filed the amended complaint on May 14, 2025. (Doc. 24). On June 6, 2025, Plaintiffs filed a motion for preliminary injunction. (Doc. 33). Oral argument was held on July 11, 2025, in Missoula, Montana. The Court denied the motion for a preliminary injunction, holding that Plaintiffs did not raise serious questions going to the merits of their case. (Doc. 51 at 21). On July

30, 2025, this Court granted a motion to intervene, filed by Defendant -Intervenors DNRC. (Doc. 56). The parties thereafter filed the instant cross-motions for summary judgment. (Docs. 63, 67, 72, 75). The motions are fully briefed and ripe for ruling.

## II.    Legal Standards

### a.    ESA

Forest Service actions, such as the Project, must comply with the ESA. Congress enacted the ESA to protect and conserve endangered and threatened species and the ecosystems they depend upon. 16 U.S.C. § 1531(b). The Supreme Court has deemed the ESA "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 180 (1978). The hallmark of the ESA is its solemn resolve that endangered species "be afforded the highest of priorities" with the goal to "halt and reverse the trend toward species extinction, whatever the cost." *Tennessee Valley Authority*, 437 U.S. at 174, 184.

The ESA and its implementing regulations require agencies proposing actions to engage in consultation with FWS to ensure the action "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species . . . ." 16 U.S.C. § 1536(a)(2). To effectuate consultation, the ESA requires action

agencies to "conduct a biological assessment for the purpose of identifying any endangered species or threatened species which is likely to be affected by such action." 16 U.S.C. §1536(c)(1); 50 C.F.R. § 402.12(a). The contents of a biological assessment are at the discretion of the Forest Service and may include "consideration of cumulative effects." 50 C.F.R. § 402.12(f)(4).

After consultation is completed between the FWS and the action agency, the FWS will issue a biological opinion "detailing how the agency action affects the species or its critical habitat." 16 U.S.C. § 1536(b)(3(A). Implementing regulations dictate the preparation and contents of the biological opinion prepared by FWS. In formal consultation, the agency must "[e]valuate the current status and environmental baseline of the listed species" and "[e]valuate the effects of the action and cumulative effects on the listed species . . . ." 50 C.F.R. § 402.14.

For purposes of the ESA, cumulative effects "are those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." 50 C.F.R. § 402.02. FWS must then "[a]dd the effects of the action and cumulative effects to the environmental baseline and in light of the status of the species and critical habitat, formulate [FWS'] opinion as to whether the action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.14.

**b.    NFMA**

NFMA provides a two-tiered approach for forest planning and management. *2-Bar Ranch Limited Partnership v. United States Forest Service*, 996 F.3d 984, 986 (9th Cir. 2021). The first tier involves planning at the forest level through USFS' development of a forest plan. *2-Bar Ranch Limited Partnership*, 996 F.3d at 986. "Forest plans are broad, programmatic documents that 'guide sustainable, integrated . . . management of the resources within the plan area in the context of the broader landscape.'" *2-Bar Ranch Limited Partnership*, 996 F.3d at 986 (quoting 36 C.F.R. § 219.1(b)). The second tier involves implementation of the forest plan to individual site-specific projects, which "must be consistent with the forest plan." *2-Bar Ranch Limited Partnership*, 996 F.3d at 986 (internal quotations omitted); 16 U.S.C. § 1604(i).

"It is well-settled that [USFS'] failure to comply with the provisions of a Forest Plan is a violation of NFMA." *Native Ecosystems Council v. U.S. Forest Service*, 418 F.3d 953, 961 (9th Cir. 2005). USFS must show that a project it undertakes complies with the governing forest plan. *Native Ecosystems Council*, 418 F.3d at 961 (citing 16 U.S.C. § 1604(i)). "A project is consistent if it conforms to the applicable 'components' of the forest plan, including the standards, guidelines, and desired conditions that are set forth in the forest plan and that collectively establish the details of forest management." *Alliance for the Wild*

*Rockies v. United States Forest Service*, 907 F.3d 1105, 1110 (9th Cir. 2018).

When reviewing for compliance with a forest plan, the Court must "be able to reasonably ascertain from the record that the Forest Service is in compliance with [the forest plan]." *Native Ecosystems Council*, 418 F.3d at 961 (citing *SEC v. Chenery Corp.,* 332 U.S. 194, 196-197 (1947). The Court will award "substantial deference" to "[USFS'] interpretation and implementation of its own forest plan." *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012).

c.    **NEPA**

NEPA is a procedural statute requiring government agencies to "take a hard look" at the "environmental consequences" of their actions. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). An agency adequately conducts a "hard look" "by providing a reasonably thorough discussion of the significant aspects of the probable environmental consequences" of a proposed action. *Center for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1194 (9th Cir. 2008) (quoting *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1149 (9th Cir. 1998)). NEPA "does not mandate particular results," but "prescribes the necessary process" agencies must follow to identify and evaluate "adverse environmental effects of the proposed action." *Robertson*, 490 U.S. at 350.

The court's review is complete if upon review of the record the court is satisfied the agency took a "hard look" at the proposed action's environmental

impacts. *Idaho Conservation League v. Mumma*, 965 F.2d 1508, 1519 (9th Cir. 1992). "[T]he central principle of judicial review in NEPA cases is deference." *Seven County Infrastructure Coalition v. Eagle County,* 605 U.S. 168, 179 (2025).

An agency may prepare an Environmental Assessment ("EA") to determine whether a proposed action may significantly affect the quality of the environment such that the agency must prepare a more detailed Environmental Impact Statement ("EIS"). *See* 40 C.F.R. § 1501.5(a) (2022). An EA is a "concise public document that briefly provide[s] sufficient evidence and analysis for determining whether to prepare an EIS or a finding of no significant impact." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998).

If an agency decides not to prepare an EIS, it must supply a "convincing statement of reasons" to explain why the project's impacts are insignificant. *Save the Yaak Committee v. Block*, 840 F.2d 714, 717 (9th Cir. 1988). "'The statement of reasons is crucial' to determining whether the agency took a 'hard look' at the potential environmental impact of the project." *Save the Yaak Committee*, 840 F.2d at 717 (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21 (1976)).

**d.    Summary Judgment**

Courts review agency decisions under NFMA, NEPA, and the ESA by applying the standard of review set forth in the APA. *Center for Biological Diversity v. Zinke*, 868 F.3d 1054, 1058 (9th Cir. 2017); *Gifford Pinchot Task*

9

*Force v. U.S. Fish and Wildlife Service*, 378 F.3d at 1065. The Rule 56 summary judgment standard is therefore modified in cases requiring review of an administrative record pursuant to the APA; courts are required to uphold agency actions unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[,]" or "without observance of procedure required by law." *Center for Biological Diversity*, 868 F.3d at 1057; 5 U.S.C. § 706(2)(A); 5 U.S.C. § 706(2)(D).

The APA standard of review is deferential. A decision is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

An agency action likewise is arbitrary and capricious if the agency fails to articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made. *Motor Vehicle Mfrs.*, 463 U.S. at 43. A court may not accept an agency's post hoc rationalizations for its action. *Motor Vehicle Mfrs.*, 463 U.S. at 50. "It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle*

*Mfrs.*, 463 U.S. at 50.

### III.    Discussion[1]

#### a.    Grizzly Bear (Claim One)

Plaintiffs first challenge the Project Biological Opinion and its analysis regarding grizzly bears. This challenge is brought pursuant to the ESA. The crux of Plaintiffs' many arguments on this issue is that, during Section 7 consultation, the agencies gave insufficient attention to roads on non-federal lands in the Project area. This topic was previously addressed at the preliminary injunction stage of this case. As explained below, the Court finds no violation of the ESA.

##### 1.    The Garrity Declarations

As a threshold matter, Plaintiffs have attached extra-record documents to their opening brief. Federal Defendants and AFRC object to the inclusion of several of these documents. (Doc. 68 at 25; Doc. 73 at 27). The attachments to Plaintiffs' opening brief include the Second Declaration of Michael Garrity (Doc. 64-1), Second Declaration of Steve Kelly (Doc. 64-2), and Second Declaration of Larry Stinger (64-3). The inclusion of the latter two declarations (Docs. 64-2; 64-3) is apparently not challenged by Defendants.

In contrast, Defendants do challenge the inclusion of the Second Declaration

---

[1] To the extent that Defendants included claims in their amended complaint that were not briefed on summary judgment, those claims are deemed waived.

11

of Michael Garrity ("Garrity declaration"). (Doc. 64-1; Doc. 68 at 25; Doc. 73 at 27). That document includes statements regarding the Montana DNRC's Short Start Timber Sale Project. (Doc. 64-1 at ¶¶ 6-12). The Garrity declaration further includes a new map (created for the declaration), which overlays the boundaries of the Short Start Timber Sale Project and the Rock Bottom Timber Sale, which was authorized as part of the Project. (Doc. 64-1 at ¶ 13). The Garrity declaration also includes statements that address the merits of Plaintiffs' legal arguments. (Doc. 64-1 at ¶¶ 14-16). Specifically, the declaration addresses the allegedly inaccurate analysis of grizzly bear secure habitat in the Project area. For instance, the declaration indicates that the purportedly deficient analysis

> is particularly problematic in this case because the Forest Service has not only incorrectly calculated the baseline road density and secure habitat in the Project area as a result of this omission, but it is also ignoring the effects of known state and private logging and active logging roads on adjacent properties within the Project area, which we know are occurring concurrent to the federal logging.

(Doc. 64-1 at ¶ 16).

Plaintiffs have also attached two exhibits accompanying the Garrity declaration. The declaration states that Exhibit 1 includes the "maps and prospectus" for the Rock Bottom Timber Sale. (Doc. 64-1 ¶ 5). The declaration further explains that Exhibit 1 documents are "publicly available on the Forest Service's website." (Doc. 64-1 at ¶ 5). Exhibit 2, according to the Garrity declaration, includes "the documents for Montana [DNRC's]

Short Start Timber Sale Project." The declaration explains that "[t]his document is publicly available on the DNRC's website." (Doc. 64-1 at ¶ 6).

The court's review of an agency action is generally limited to the administrative record. 5 U.S.C. § 706. Administrative review accordingly disfavors consideration of extra-record evidence. *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court"). Indeed, "[w]hen a reviewing court considers evidence that was not before the agency, it inevitably leads the reviewing court to substitute its judgment for that of the agency." *Asarco, Inc. v. U.S. Envtl. Prot. Agency*, 616 F.2d 1153, 1160 (9th Cir. 1980).

The Ninth Circuit recognizes four "narrow exceptions" to the general rule prohibiting extra-record evidence: (1) when supplementation is necessary to determine whether the agency has considered all factors and explained its decision; (2) when the agency relied on documents not in the record; (3) to explain or clarify technical matters or complex subjects; and (4) where plaintiffs make a strong showing of agency bad faith. *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005). These exceptions are limited in scope and must not undermine the general rule that the court's review is limited to the administrative record. *Lands Council*, 395 F.3d at 1030. Because the agency's "designation and certification of

an administrative record" is entitled to a "presumption of regularity," the plaintiff must provide "clear evidence" that one of the above exceptions applies. *Pinnacle Armor, Inc. v. United States*, 923 F. Supp. 2d 1226, 1232 (E.D. Cal. 2013).

Separately, Federal Rule of Evidence 201 allows a court to take judicial notice of certain "adjudicative facts." Fed. R. Evid. 201. A court may take judicial notice of undisputed "matters of public record," including other state or federal court proceedings, *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001); *Duckett v. Godinez*, 67 F.3d 734, 741 (9th Cir. 1995), as well as facts that are "not subject to reasonable dispute" because they are either "generally known within the territorial jurisdiction of the trial court" or "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986); Fed. R. Evid. 201(b). Courts may also take judicial notice of "records and reports of administrative bodies." *Mack v. S. Bay Beer Distribs., 798 F.2d 1279, 1282 (9th Cir. 1986)* (citing *Interstate Nat. Gas Co. v. S. Cal. Gas. Co.*, 209 F.2d 380, 385 (9th Cir. 1953)).

However, as courts in this District have previously held, "a party cannot circumvent the rules governing record supplementation by asking for judicial notice rather than supplementation." *Alliance for the Wild Rockies v. Probert*, 412 F. Supp. 3d 1188, 1198 (D. Mont. 2019) (quoting *Alliance for the Wild Rockies v.*

*Marten*, No. CV 16-35-M-DWM, 2016 WL 7174671 at *3 (D. Mont. Oct.3, 2016) (internal quotation marks omitted)).

In their opening brief, Plaintiffs state that the Court may take judicial notice of the attached documents pursuant to Federal Rule of Evidence 201(b)(2). (Doc. 64 at 21 n. 14). In their response brief, Plaintiffs separately argue (Doc. 78 at 35) that the extra-record documents should be admitted under the first of the *Lands Council* exceptions ("when supplementation is necessary to determine whether the agency has considered all factors and explained its decision"). *Lands Council*, 395 F.3d at 1030. At oral argument, Plaintiffs indicated that the extra-record documents could be validly considered under either standard. Both AFRC and Federal Defendants ask that the Court strike the Garrity Declaration and attachments. (Doc. 68 at 25, Doc. 73 at 27).

Plaintiffs' request that the Court consider the contents of the Garrity declaration and exhibits is not well taken. As an initial matter, the Court will not take judicial notice of the documents. Plaintiffs have attempted to justify the inclusion of the documents under the standard for judicial notice *and* under one of the *Lands Council* exceptions. Plaintiffs do not explain why this should be considered as anything other than an attempt to "circumvent the rules governing record supplementation by asking for judicial notice rather than supplementation." *Alliance for the Wild Rockies v. Probert*, 412 F. Supp. 3d at 1198. Accordingly, the

Court need only address whether the Garitty declaration and exhibits is "necessary to determine whether the agency has considered all factors and explained its decision." *Lands Council*, 395 F.3d at 1030.

To that end, Plaintiffs claim that the Garrity declaration is relevant to show that USFS was arbitrary and capricious for concluding that state and federal timber sales across the Project area would not occur at different times. The merits of that claim are considered in greater detail below. In short, the Court finds no fault with USFS' analysis of the timing of timber sales. Plaintiffs' claim on this issue generally rests on passages found in the Project Biological Opinion and Biological Assessment that plainly address the relative timing between sales authorized by the Project and do not address sales authorized by the state of Montana.

Accordingly, the Garrity declaration and exhibits would not change the essential fact that the passages cited by Plaintiffs do not address the timing of state timber sales. While the Garrity declaration includes argument[2] about an overall lack of consideration regarding timber sales, the actual claim advanced by Plaintiffs in their opening brief is much narrower, and only addresses whether the agency inaccurately stated that state and federal timber sales would occur at different times. The resolution of this issue does not require recourse to other

---

[2] The Garrity declaration also includes legal argument that speaks to the merits of Plaintiffs' claims. (*See* Doc. 64-1 at ¶¶ 15-16). Such argument is entirely inadmissible.

16

documents. Accordingly, the Garrity declaration is not necessary for the resolution of this issue and does not satisfy the *Lands Council* exception raised by Plaintiffs. *Lands Council*, 395 F.3d at 1030.

In addition, Plaintiffs cite to the Garrity declaration and exhibits in support of their argument that the Project Biological Opinion's analysis of secure habitat on federal lands did not properly incorporate information regarding roads on state and private lands. (Doc. 64 at 25). As set forth in more detail below, the Court finds that this line of argument cannot meaningfully affect the ultimate resolution of Plaintiffs' cumulative effects claims, irrespective of whether the extra-record documents are considered. Accordingly, the Garrity declaration and exhibits are not necessary for the determination of this issue and do not fall within the cited *Lands Council* exception.

Plaintiffs have not shown that supplementation is necessary to determine whether the agency has considered all factors and explained its decision. Therefore, Plaintiffs fail to demonstrate that the extra-record evidence in the Garrity declaration and attachments should be considered under the *Lands Council* exception. Accordingly, the Court will not consider the extra-record evidence in the Garrity declaration and its attachments.

### 2.   Cumulative Effects

Plaintiffs first challenge to the Project Biological Opinion addresses the

cumulative effects analysis regarding grizzly bears. The resolution of this issue turns on whether, in considering the consequences of non-federal actions, FWS should have included a more in-depth analysis of roads on state and private lands within the Project area. According to Plaintiffs, "[s]cience and this Court's precedent is clear—under the ESA, a sufficient cumulative effects analysis requires understanding road densities that include non-federal lands." (Doc. 64 at 17).

The issue of road densities and cumulative effects on grizzly bears was previously addressed in this matter when the Court considered Plaintiffs' motion for a preliminary injunction. Briefing on this issue at that stage largely focused on another case from this District, *Alliance for the Wild Rockies v. Gassman*. 678 F. Supp. 3d 1249 (D. Mont 2023). Considering the implications of *Gassman*, this Court held that "Plaintiffs' arguments concerning the matter at hand go beyond [*Gassman's*] holding." (Doc. 51 at 14).

Distinguishing *Gassman*, this Court focused on (1) the lack of a demonstrably false assumption on the part of Federal Defendants in preparing the cumulative effects analysis, (2) the lack of an "analogous, post-hoc rationalization" on the part of the agencies, and (3) the fact that secure habitat on non-federal lands in that case was uniquely significant. (Doc. 51 at 13-14). Ultimately, the Court found that the Project Biological Opinion contained a sufficient, qualitative analysis of roads and activities on non-federal lands in the Project area. (Doc. 51 at

18

14).

Plaintiffs' arguments regarding cumulative effects focus largely on further analogizing to the *Gassman* decision and minimizing this Court's decision on the motion for preliminary injunction. Plaintiffs dedicate significant briefing to explaining why, in their view, the Court's prior order incorrectly distinguished *Gassman* from the facts at hand. Considering the available evidence, the Court again finds that the Project cumulative effects analysis adequately considered the impacts of roads on non-federal lands in the Project area and that *Gassman* is distinguishable from the facts of this case. The Court will address Plaintiffs' arguments in turn.

Plaintiffs first argue "[t]his case is materially indistinguishable from *Gassman*." (Doc. 64 at 19). In support, Plaintiffs state that at, as in *Gassman*, the facts at hand involve (1) "imperiled Cabinet-Yaak grizzly bears and the consequences of logging and road building in legally-designated connectivity zones" and (2) grizzly bears occurring on private lands with the Project area. (Doc. 64 at 19). The Court agrees that there are some factual similarities between *Gassman* and the Project. However, there are also important differences between the two cases and projects. Many of these differences are explained in the order on preliminary injunction. (Doc. 51 at 13-14). That this case may at some level implicate Cabinet-Yaak bears and also involves non-federal lands is still not

sufficient to outweigh the important dissimilarities between the Project and the facts at issue in *Gassman*.

In furtherance of their analogy to *Gassman*, Plaintiffs address a statement the Court made in its order on the motion for preliminary injunction. Distinguishing *Gassman*, this Court held:

> Here, there is no indication that any secure habitat on non-federal land in the Project area is of a similar significance [to the secure habitat on non-federal land in *Gassman*]. Indeed, the administrative record indicates the Project area is subject to widespread development, and largely falls within the wildland-urban interface.

(Doc. 14 at 21, citing FS004683). Critiquing this reasoning, Plaintiffs claim that the Court "relied on a statement from *Gassman* regarding counsel's claims 'in their briefing' that 'bears in the Project area primarily occur on private lands.'" (Doc. 64 at 20, quoting *Gassman*, 678 F. Supp. 3d at 1282). Therefore, Plaintiffs argue that the distinction drawn by the Court is "immaterial and factually false." (Doc. 64 at 20). Plaintiffs also allege that the Court relied on statements in *Gassman* regarding information that arose during briefing in that case.

Plaintiffs are correct that the *Gassman* court considered contradictory representations made in briefing.

> Despite claiming elsewhere in their briefing that the bears in the Project area primarily occur on private lands, Defendants' approach to cumulative effects assumes that state and private lands provide no secure habitat for grizzly bears.

*Gassman,* 678 F. Supp. 3d at 1282. However, the court also explained

> This approach defeats the purpose of the cumulative effects analysis, especially in this Project area, given that the record indicates grizzly bears are occurring more often on non-federal lands and thus may be affected by activities on non-federal lands.

*Gassman*, 678 F. Supp. 3d at 1282. The *Gassman* court then went on to explain precisely why the demonstrably false assumption offered in support of the cumulative effects analysis was deficient under the law.

> If, tomorrow, the State and private lands within the Project area suddenly provided no secure habitat for grizzly bears, the bears presumably would relocate to other nearby areas providing secure habitat, including federal lands within the Project area.

*Gassman*, 678 F. Supp. 3d at 1282-83. Accordingly, false assumptions particular to the facts of that case were material to the outcome and factually dissimilar to this case. As established at the preliminary injunction stage, this Court continues to find that *Gassman,* as it relates to the issue of secure habitat on non-federal lands, is distinguished from the facts of the matter at hand.

Plaintiffs next highlight "[t]hree incorrect assumptions" that "undermine the Project's cumulative effects analysis." (Doc. 64 at 21). These allegedly incorrect assumptions are apparently offered in relation to the Court's decision to distinguish *Gassman* at the preliminary injunction stage. Plaintiffs introduce this argument concerning *Gassman* by stating that "[t]he distinction made by this Court and the agencies is factually false for the following three reasons . . . ." (Doc. 64 at 21). In other words, Plaintiffs are raising these three "incorrect assumptions" not because

they speak directly to the merits of this issue, but because they support analogy to

*Gassman*. As explained below, none of these purported inaccuracies is sufficient to

establish wrongdoing on the part of the agencies. The Court will address each in

turn.

First, Plaintiffs argue that "[t]he agencies incorrectly assumed Project timber

sales and state and private activities will differ in time and space, despite the

evidence before them." (Doc. 64 at 21). Plaintiffs quote the following language

from the Biological Opinion cumulative effects analysis:

> The multiple sales scheduled for the Round Star Project will likely
> differ in time and space, allowing some areas of secure habitat for
> grizzly bears despite the additional activities going on within the State
> and private lands.

(FWS000034). Similar language is also found in the Biological Assessment.

(FS012069). Plaintiffs argue that this passage indicates the existence of secure

habitat on non-federal lands in the Project area. Plaintiffs further argue that the

statement regarding the timing of timber sales is incorrect because a Montana

DNRC project will take place during "same time and in the same space" as the

Rock Bottom Timber Sale, authorized under the Project. (Doc. 64 at 21).

Considering these arguments, the Court finds no issue with the cited passage

in the cumulative effects analysis. The sentence does not address secure habitat on

non-federal lands, but merely indicates that there will be secure habitat on federal

lands and acknowledges that Round Star sales will occur at different times and in

22

different locations. Similarly, the statement is not contradicted by any potential state timber sales that might occur at the same time as the Project-authorized sales; instead, it assumes the overlap of activities on state and private lands.

Second, Plaintiffs allege that "[t]he record offers no explanation as to why the agencies did not consider secure habitat on non-federal lands in the Project area." (Doc. 64 at 22). In response, Defendants generally argue that the relevant data to inform secure habitat analysis across non-federal lands was not available. Questions regarding existence, availability, and necessity of data that would inform a secure habitat analysis on non-federal lands also forms basis for arguments on the issue of best available science, addressed in detail below. In short, without a showing that relevant data exists and should have been used, Plaintiffs' presentation of this argument in this context is unavailing.

Third, Plaintiffs allege that "[t]he agencies falsely assumed no open or gated roads exist on non-federal lands within 500 meters of any federal lands." (Doc. 64 at 24). According to Plaintiffs, this assumption skews the secure habitat analysis on federal lands. Therefore, Plaintiffs argue that by not considering roads on non-federal lands, the Biological Assessment and Biological Opinion exaggerate the quantity of secure habitat on federal lands.

Federal Defendants assert that this secure habitat buffering argument constitutes a new claim and was not raised in Plaintiffs' complaint. As such,

23

Federal Defendants argue that the buffering issue is not properly before the Court. (Doc. 68 at 30). In response, Plaintiffs emphasize that the issue of buffering is not offered as a separate claim. (Doc. 78 at 27). Instead, Plaintiffs insist they are making this argument in response to the Court's determination at the preliminary injunction stage that the *Gassman* decision is distinguishable from the facts of this case.

> Defendants spin this issue into something it is not—a new legal claim. Because at the preliminary injunction stage Defendants persuaded the Court *Gassman* is distinguishable on these exact grounds . . . the [discussion at hand] is a component of that issue and illustrates why the Court should reconsider the merits of its prior finding.

(Doc. 78 at 27, citations omitted).

In other words, Plaintiffs ask the Court to consider the buffering issue in support of analogy to *Gassman*. With that limited scope of argument in mind, the Court finds that, even if Plaintiffs' assertion was accurate, it would not meaningfully affect the resolution of this issue. It is unclear how such an error would meaningfully shift this case closer towards the holding in *Gassman*.

Considered together, none of the alleged factual inaccuracies highlighted by Plaintiffs support their claim that the Project's cumulative effects analysis is insufficient under *Gassman* or the ESA. Nor do the alleged factual inaccuracies establish wrongdoing on the part of the agencies.

Ultimately, *Gassman* remains distinguishable from the facts of this case.

Plaintiffs have not established a deficiency with the qualitative treatment of roads and activities on non-federal lands in the Biological Opinion's cumulative effects analysis regarding grizzly bears.

### 3.      No-Jeopardy Determination

Plaintiffs next argue that because the agencies did not fully address road density and secure habitat across the Project area, FWS' no-jeopardy finding regarding grizzly bear is arbitrary and capricious. (Doc. 64 at 25). In essence, Plaintiffs argue that a meaningful effects analysis would require an understanding of roads and secure habitat on non-federal land. "[T]he agencies' omission of the cumulative road density and the cumulative effects of non-federal activities on grizzly bears renders the analysis arbitrary and capricious." (Doc. 64 at 27-28).

The substance of this issue appears to be the same as throughout Plaintiffs briefing on grizzly bears. Namely, Plaintiffs allege that the cumulative effects analysis paid insufficient attention to roads and secure habitat, and was accordingly deficient. In response, Defendants point out that Plaintiffs' complaint does not contain a claim addressing the Project's no-jeopardy finding. Therefore, Defendants argue, the issue is improperly raised for the first time on summary judgment.

The Court agrees that any challenge to the Project's no-jeopardy determination that goes beyond cumulative effects and the other issues addressed

in the amended complaint would be improperly raised. Accordingly, to the extent that Plaintiffs make new arguments related to the Project no-jeopardy determination, those arguments are not properly before the Court. Further, to the extent that this claim appears represented in the amended complaint, any such argument appears to duplicate other portions of Plaintiffs' briefing. (*See* Doc. 25 at ¶¶ 109-116).

### 4. Best Available Science

Plaintiffs next argue that Federal Defendants unlawfully excluded or failed to seek out relevant information regarding roads on non-federal lands. According to Plaintiffs, this constitutes a violation of the ESA's best available science requirement. (Doc. 64 at 28).

Under the ESA, consulting agencies must use "the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g). A failure to do so is arbitrary and capricious, and a violation of the APA. *San Luis & Delta–Mendota Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014). In determining what constitutes the best available science, agencies are entitled to significant deference. "The determination of what constitutes the '*best* scientific data available' belongs to the agency's 'special expertise . . . . When examining this kind of scientific determination, as opposed to simple findings of fact, a reviewing court must generally be at its most deferential.'" *San Luis & Delta–Mendota Water*

26

*Auth. v. Jewell*, 747 F.3d at 602 (quoting *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 103, (1983)).

The scope of the ESA's best available science requirement is limited and "merely prohibits [an agency] from disregarding available scientific evidence that is in some way better than the evidence [it] relies on." *Kern Cnty. Farm Bureau*, 450 F.3d 1072, 1080 (9th Cir. 2006) (quoting *Sw. Ctr. for Biological Diversity v. Babbitt*, 215 F.3d 58, 60 (D.C. Cir.2000)). "Mere disagreement" with the conclusions reached by an agency in preparing a biological opinion does not substantiate a violation of the requirement. *Cascadia Wildlands v. Thrailkill*, 806 F.3d 1234, 1241 (9th Cir. 2015) (citing *United States v. Lewis,* 611 F.3d 1172, 1180 (9th Cir.2010)). "This standard does not require the agency to 'conduct new tests or make decisions on data that does not yet exist.'" *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 807 F.3d 1031, 1047 (9th Cir. 2015) (quoting *San Luis & Delta–Mendota Water Authority v. Locke,* 776 F.3d at 996).

Plaintiffs highlight two sources of data that they claim Federal Defendants failed to seek out or disclose. First, Plaintiffs claim that Federal Defendants "did not disclose changes to roads reasonably certain to occur as a part of a timber sale on state lands." (Doc. 64 at 28). In support, Plaintiffs highlight correspondence in the administrative record between USFS and DNRC. (Doc. 64 at 28, citing FS009048). Second, Plaintiffs point out a table that quantifies county and private

27

roads in modeled wolverine dispersal habitat across the Project action area. (Doc. 64 at 29, citing FS004810).

In response, Defendants generally argue that there was no requirement to seek out additional data, and that the qualitative analysis contained in the Biological Opinion and Biological Assessment was sufficient. AFRC further argues that, even if the agencies had obtained and disclosed the data that Plaintiffs highlight, there is no indication that "complete" information was available. (Doc. 73 at 33). Indeed, the record appears to reflect that complete data on roads on state and private lands is unavailable. (*See* FWS001559).

At most, Plaintiffs have highlighted the existence of some additional data regarding roads on non-federal lands. What they have failed to establish is the availability of the complete data set that would inform the analysis they seek. This is particularly true for data regarding roads on private lands. The ESA's best available science standard does not require an agency to "make decisions on data that does not yet exist." *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 807 F.3d at 1047. Accordingly, the Court does not find that the agencies failed to consider the best available science.

In total, and for the reasons set forth above, the Court finds that Plaintiffs have not established that the Project cumulative effects analysis' treatment of roads and secure habitat on non-federal lands failed to meet the requirements of the ESA.

Accordingly, the Court finds no issue with the Project Biological Opinion as it concerns grizzly bears.

**b.      WUI Exemption to the Lynx Amendment (Claim Two)**

Next, Plaintiffs challenge the Project's compliance with Forest Plan standards involving project activities in Canada lynx habitat. Plaintiffs argue USFS "cannot establish it is entitled to log lynx habitat under the [wildland-urban interface] exemption to the Lynx Amendment" and that the Project therefore violates NFMA, HFRA, and NEPA. (Doc. 64 at 29, 36). Plaintiffs specifically address the Project's compliance with the HFRA requirements for designating the boundary of the wildland-urban interface ("WUI").

In order to satisfy the requirements of NFMA, the Project must comply with the requirements of the applicable land management plan; here the Flathead National Forest Land Management Plan ("Forest Plan"). (FS000001). The Forest Plan incorporates requirements from the Northern Rockies Lynx Management Direction, promulgated in 2007 by the USFS and known as the "Lynx Amendment." (FS020792). The Lynx Amendment applies to "all National Forest System lands that are known to be occupied by Canada lynx." (FS020799).

Requirements under the Lynx Amendment are generally incorporated in the Forest Plan via standard FW-STD-WL-04. (FS002835). Forest Plan Appendix A sets out the full requirements of the Lynx Amendment, as incorporated in the

Forest Plan. (FS000223-241). Several Lynx Amendment standards are at issue in this case, all of which concern limits on vegetation management, disturbance, and other activities within designated Lynx Analysis Units. As explained in greater detail below, these standards also include exemptions for activities that take place within the WUI.

The Project area overlaps portions of three Lynx Analysis Units. (FS001205). Given that Project activities will take place in these Lynx Analysis Units, all parties apparently agree that the Project's compliance or noncompliance with the Lynx Amendment Standards—and therefore the Forest Plan—is in part premised on exemptions to those standards for activities that take place in the WUI.

The Project EA indicates that compliance with Lynx Amendment Standard VEG S5 depends on the application of the WUI exemption:

> Proposed precommercial thinning in the WUI would reduce stand initiation lynx forage habitat by an estimated 1,396 acres using an exemption to the VEG S5 standard for fuel treatment projects within the WUI (as defined by the Health Forest Restoration Act).

(FS004792). The implicated standard, VEG S5 limits "precommercial thinning" in "stand initiation" lynx forage habitat. (FS000228).

Similarly, the EA indicates that the Project also relies on a WUI exemption to meet Lynx Amendment Standard VEG S6:

> 374 acres of vegetation management is proposed in multistory lynx

30

forage habitat in the WUI which includes 220 acres of regeneration and 154 acres of intermediate treatments. An exemption to the VEG S6 standard for fuel treatment projects within the WUI (as defined by the Healthy Forest Restoration Act) would be used to complete these activities.

(FS004792). Standard VEG S6 limits "vegetation management projects that reduce snowshoe hare habitat in multistory mature or late successional forests." (FS000229, footnotes omitted). Both Standard VEG S5 and Standard VEG S6 provide exemptions for projects within the WUI "as defined by HFRA." (FS00227-29).

The HFRA definition of the WUI is found at 16 U.S.C. § 6511(16). The relevant statutory language reveals two distinct definitions for the WUI:

The term "wildland-urban interface" means—

(A) an area within or adjacent to an *at-risk community* that is identified in recommendations to the Secretary in a community wildfire protection plan; or

(B) in the case of any area for which a community wildfire protection plan is not in effect—

(i) an area extending ½ -mile from the boundary of an *at-risk community*;

(ii) an area within 1 ½ miles of the boundary of an *at-risk community*, including any land that—

(I) has a sustained steep slope that creates the potential for wildfire behavior endangering the at-risk community;

(II) has a geographic feature that aids in creating

31

> > an effective fire break, such as a road or ridge top; or
> >
> > (III) is in condition class 3, as documented by the Secretary in the project-specific environmental analysis; and
>
> (iii) an area that is adjacent to an evacuation route for an *at-risk community* that the Secretary determines, in cooperation with the at-risk community, requires hazardous fuel reduction to provide safer evacuation from the at-risk community.

16 U.S.C. § 6511(16) (emphasis added).

The Ninth Circuit has interpreted the definition under subsection (B) as providing a "baseline protection of at least 0.5 or 1.5 miles around at-risk communities." In conjuncture with that .05-mile baseline, subsection (A) allows "communities with plans to identify wildland-urban interfaces that extend beyond those strict limitations to meet their communities' needs." *Alliance for the Wild Rockies v. Petrick*, 68 F.4th 475, 496 (9th Cir. 2023). Accordingly, if a community wildfire protection plan is in place, the WUI boundary may be determined or analyzed according to either definition. *Petrick,* 68 F.4th at 496 ("[W]e conclude that the statutory scheme gives communities with plans more—not less—flexibility.").

Both WUI definitions include the term "at-risk community." For the purposes of HFRA, "at-risk community is defined at 16 U.S.C. § 6511(1), which provides:

The term "at-risk community" means an area—

    (A) that is comprised of—

        (i) an interface community *as defined in the notice entitled "Wildland Urban Interface Communities Within the Vicinity of Federal Lands That Are at High Risk From Wildfire"* issued by the Secretary of Agriculture and the Secretary of the Interior in accordance with title IV of the Department of the Interior and Related Agencies Appropriations Act, 2001 (114 Stat. 1009) (66 Fed. Reg. 753, January 4, 2001); or

        (ii) a group of homes and other structures with basic infrastructure and services (such as utilities and collectively maintained transportation routes) within or adjacent to Federal land;

    (B) in which conditions are conducive to a large-scale wildland fire disturbance event; and

    (C) for which a significant threat to human life or property exists as a result of a wildland fire disturbance event.

16 U.S.C. § 6511(1) (emphasis added).

This definition requires reference to "the notice entitled 'Wildland Urban Interface Communities Within the Vicinity of Federal Lands That Are at High Risk From Wildfire,'" ("the Notice") found at 66 Fed. Reg. 754. In relevant part, that notice states:

The initial definition of urban wildland interface and the descriptive categories used in this notice are modified from "A Report to the Council of Western State Foresters—Fire in the West—The Wildland/Urban Interface Fire Problem" dated September 18, 2000. Under this definition, "*the urban wildland interface community* exists where humans and their development meet or intermix with wildland

fuel." There are three categories of communities that meet this description.

Urban Wildland Interface Communities Within the Vicinity of Federal Lands That Are at High Risk From Wildfire, 66 FR 751-02 (emphasis added).

The Notice further describes the three categories of communities that meet the description of "wildland interface community."

*Category 1. Interface Community*

The Interface Community exists where structures directly abut wildland fuels. There is a clear line of demarcation between residential, business, and public structures and wildland fuels. Wildland fuels do not generally continue into the developed area. The development density for an interface community is usually 3 or more structures per acre, with shared municipal services. Fire protection is generally provided by a local government fire department with the responsibility to protect the structure from both an interior fire and an advancing wildland fire. An alternative definition of the interface community emphasizes a population density of 250 or more people per square mile.

*Category 2. Intermix Community*

The Intermix Community exists where structures are scattered throughout a wildland area. There is no clear line of demarcation; wildland fuels are continuous outside of and within the developed area. The development density in the intermix ranges from structures very close together to one structure per 40 acres. Fire protection districts funded by various taxing authorities normally provide life and property fire protection and may also have wildland fire protection responsibilities. An alternative definition of intermix community emphasizes a population density of between 28-250 people per square mile.

*Category 3. Occluded Community*

The Occluded Community generally exists in a situation, often within a city, where structures abut an island of wildland fuels (e.g., park or open space). There is a clear line of demarcation between structures and wildland fuels. The development density for an occluded community is usually similar to those found in the interface community, but the occluded area is usually less than 1,000 acres in size. Fire protection is normally provided by local government fire departments.

66 FR 751-02.

Considered together, these interrelated definitions and requirements produce a complicated statutory scheme. "In fairness, HFRA is not a model of clarity and contains several interrelated provisions." *Petrick*, 68 F. 4th at 495. However, in this context, analyzing the validity of the WUI designation can be broken down into three basic steps.

The first step is to determine whether the WUI is defined under subsection 16 U.S.C. § 6511(1)(A) or (B). Subsection (A) refers to the WUI as designated in a community wildfire protection plan, while (B) refers to specific, statutory criteria. The second step, under either subsection, is to determine whether the WUI is validly established based on the geographic presence of an "at-risk community." Assuming that the requirements for an "at-risk community" are satisfied, the third step is to determine whether the remaining criteria under either § 6511(16)(A) or (B) are satisfied. The Court will consider the Project's compliance with each of these steps in turn.

35

### 1.    Applicable WUI Boundary

As a threshold matter, Plaintiffs argue that "it is unclear from the record which WUI definition the Forest Service relies on for its Project WUI." (Doc. 64 at 36). In support, Plaintiffs highlight apparently contradictory statements from the Project EA. First, the introduction to the EA states that 87 percent of the Project's vegetation management activities are "located within the wildland-urban interface . . . established by the 2011 and 2020 Flathead County Community Wildfire Protection Plans . . . ." (FS0004733). Second, as cited above, the EA indicates that the Project complies with Standard VEG S5 and Standard VEG S6 pursuant to an exemption for fuel treatment projects "within the WUI (as defined by the Healthy Forest Restoration Act)." (FS004792). Plaintiffs challenge the Project's compliance under either WUI definition.

Regarding the apparently contradictory statements about how the WUI boundary was determined, Defendants argue that Plaintiffs have misread the administrative record. (Doc. 68 at 39). In particular, Federal Defendants explain that although the EA references the 2020 Flathead County Community Wildfire Protection Plan ("Community Plan"), USFS also separately determined the extent of the WUI pursuant to the statutory criteria found in 16 U.S.C. § 6511(16)(B). Federal Defendants argue this latter WUI boundary—derived from HFRA's statutory criteria under § 6511(16)(B)—was used to determine compliance with the

Lynx Amendment standards. (Doc. 68 at 39-40).

Federal Defendants explain that the boundary set forth in the Community Plan was merely used to determine the impacts of the Project and not to establish compliance with HFRA and the Lynx Amendment standards. In essence, Federal Defendants argue that, where the administrative record refers to the WUI "as defined by [HFRA]," that the boundary was determined pursuant to the statutory criteria of § 6511(16)(B).

Considering together the various references to the WUI boundary that appear throughout the EA and related documents in the administrative record,[3] the Court is unable to discern how USFS determined and applied the WUI boundary for the Project.

The primary problem with the distinction offered by Defendants in the briefing on this motion is the ambiguity in the phrase "as defined by [HFRA]." Although Federal Defendants argue that phrase solely refers to a WUI boundary determined according to § 6511(16)(B), the HFRA statutory scheme plainly includes two different definitions. Accordingly, the statement "as defined by [HFRA]" could reasonably refer to either § 6511(16)(A) or (B).

Of itself, the lack of clarity regarding which boundary was used to determine

---

[3] (*See* FS004688; FS004694; FS004733; FS004764; FS004792; FS004792; FS004797; FS004838; FS004683).

Project compliance with the Lynx Amendment standards does not establish a violation of NFMA. If both boundaries were compliant with the statutory requirements of HFRA, it might not matter which boundary was used to determine compliance with the relevant standards. For their part, Plaintiffs argue that neither WUI boundary meets the requirements of HFRA. (Doc. 64 at 37-38).

In response, Defendants argue that (1) the Community Plan boundary was not used to determine compliance with the Lynx Amendment standards and (2) the boundary established pursuant to § 6511(16)(B) meets the requirements of HFRA. Notably, none of the Defendants argue that the Community Plan boundary complies with HFRA. Moreover, Federal Defendants affirmatively stated during oral argument that the Community Plan boundary does not satisfy HFRA.

Because the Community Plan boundary appears to fall short of HFRA's requirements, the confusion surrounding which plan was used establishes a violation of NFMA. At best, USFS' references to WUI boundary in the administrative record are confusing and ambiguous. Perhaps the agency did intend to uniformly distinguish the two possible WUI boundaries, describing only one as "defined by [HFRA]." But without further explanation in the record, that distinction would still lack the clarity necessary for the Court "to reasonably ascertain from the record that the Forest Service is in compliance with [the forest plan]." *Native Ecosystems Council*, 418 F.3d at 961. Furthermore, Defendants'

explanation prompts the question of why the agency would rely on two different WUI boundaries in the record without explicitly differentiating them at the outset. At worst, the agency relied on the Community Plan and a WUI boundary that was not compliant with HFRA. Accordingly, the Court is unable to reasonably determine compliance with the Forest Plan and NFMA.

### 2.    At-Risk Community

Plaintiffs next challenge the validity of USFS' HFRA boundary determined pursuant to § 6511(16)(B). The resolution of Plaintiff's challenge to this boundary rests on the definition of "at-risk community." As explained above, the various HFRA definitions of WUI under § 6511(16) all establish a boundary around an "at-risk community." That term, "at-risk community," is further defined at § 6511(1). That definition references the Notice, which described three different kinds of urban wildland interface communities. Urban Wildland Interface Communities Within the Vicinity of Federal Lands That Are at High Risk From Wildfire, 66 FR 751-02.

Concerning USFS' WUI Boundary, Plaintiffs allege that the agency mapped the boundary according to methods that conflict with the statutory language of HFRA and internal USFS guidance that also defines "at-risk communities." (Doc. 64 at 38).

Regarding these methods, Plaintiffs highlight language where USFS

describes how it prepared its WUI maps for the Project. The document, titled

"Flathead National Forest 2024 HFRA Analysis Process" states that

"[c]ommunities were created by hand drawing a polygon around the clusters of

buffers that had more than one structure within it." (FS008968). According to

Plaintiffs, this process conflicts with Forest Service Region One guidance (also

included in the administrative record) that states that states that "at-risk

communities" are "a group of buildings, typically three or more per acre" with

"shared municipal services" and infrastructure. (FS008965).

Defendants argue that, despite the apparent contradiction between these

agency documents, USFS' analysis must ultimately be measured against the

statutory requirements of HFRA. (Doc. 68 at 41-42). Specifically, Defendants

argue, USFS' analysis relied on the definition of an intermix community, as

provided in the Notice referenced in 16 U.S.C. § 6511(1). As above, that definition

states:

> The Intermix Community exists where structures are scattered
> throughout a wildland area. There is no clear line of demarcation;
> wildland fuels are continuous outside of and within the developed
> area. The development density in the intermix ranges from structures
> very close together to one structure per 40 acres.

66 FR 751-02.

On reply, Plaintiffs make two primary arguments concerning the

applicability of the "intermix" designation. First, Plaintiffs argue that "nowhere in

40

the Project documents does the Forest Service characterize the Round Star Project area as an intermix community." (Doc. 78 at 42). However, to penalize USFS solely for not including the term "intermix" in the administrative record would amount to a "magic words" review of the record. In this instance, the appearance or non-appearance of the term "intermix" in the record is not sufficient to establish a violation of NFMA. This argument accordingly fails.

Second, Plaintiffs argue that the statutory reference to "interface community" in 16 U.S.C. § 6511(1) refers not to all three types of communities described in the Notice ("interface," "intermix," and "occluded,"), but only to the first category—"interface communities." Under that interpretation, USFS' reliance on the "intermix" designation would render the WUI boundary—established pursuant to 16 U.S.C. § 6511(1)(B)—arbitrary and capricious.

Courts in this District have previously held that intermix communities, as described in the Notice, are among the categories of communities that fall under the umbrella term "interface community," as used in 16 U.S.C. § 6511(1). *Alliance for the Wild Rockies v. U.S. Forest Serv.*, No. CV 21-84-M-DLC, 2023 WL 5427921, at *12 (D. Mont. Aug. 23, 2023) ("As discussed above, this would qualify Red Lodge as an intermix community, which is one of the identified categories of interface communities recognized under HFRA."); *Alliance for the Wild Rockies v. Marten*, 464 F. Supp. 3d 1169, 1177 (D. Mont. 2020).

41

Despite an apparently conflicting interpretation advanced in another District,[4] the Court elects to follow the precedent set by decisions from this District. As a matter of law, an intermix community as described in the Notice may validly constitute an "at-risk community" as that term is used in § 6511(1)(A)(i). Because Plaintiffs do not point to any evidence to show that USFS' WUI boundary fails to satisfy the requirements of an intermix community, the Court finds no violation to that effect.

### 3.    Remaining Statutory Criteria

Plaintiffs' final argument regarding the WUI boundary concerns USFS' application of a 1.5-mile buffer around at-risk communities. The record makes clear that USFS mapped a WUI boundary which extends 1.5 miles from the boundary of identified at-risk communities. While HFRA establishes a "baseline" .5-mile buffer around at-risk communities, the presence of certain landscape features may justify the use of a 1.5-mile buffer. *See Petrick*, 68 F.4th at 496.

In particular, 16 U.S.C. § 6511(16)(B)(ii) clarifies that WUI may refer to "an

---

[4] The United States District Court for the District of Idaho reached the opposite conclusion in *Alliance for the Wild Rockies v. Pierson.* 550 F. Supp. 3d 894, 902 (D. Idaho 2021), *vacated and remanded on other grounds sub nom. Alliance for the Wild Rockies v. Petrick*, 68 F.4th 475 (9th Cir. 2023). That court held that only the first category of community ("Interface Community") from the Notice qualifies as an "at-risk community" for the purposes of 16 U.S.C. § 6511(1). *Pierson*, 550 F. Supp. 3d at 902 ("Respectfully, this Court disagrees with this conclusion in [*Alliance for the Wild Rockies v. Marten*, 464 F. Supp. 3d 1169].").

area within 1 ½ miles of the boundary of an at-risk community, including any land that . . . has a sustained steep slope that creates the potential for wildfire behavior endangering the at-risk community." Plaintiffs generally challenge USFS' application of the 1.5-mile buffer in developing WUI boundaries for the Project. (Doc. 64 at 38-39).

In support of their arguments, Plaintiffs again cite to USFS's "Flathead National Forest 2024 HFRA Analysis Process" document, which was apparently used to generate at least some of the WUI boundaries used in determining project compliance with the Lynx Amendment standards. That document states:

> Criteria for defining this buffer was determined to focus on steep terrain. The WO guidance is to use slopes greater than 30% for the 1.5-mile buffer and that the buffer applies to entire perimeter of the community even if the slope doesn't. After reviewing the slope, it was determined that we would use the 1.5 mile buffer for the entire Forest as there are steep slopes in proximity to all communities that will generate accelerated fire behavior.

(FS008968).

Plaintiffs argue that the record does not support the contention that there are sustained steep slopes in proximity to all at-risk communities in the Project area. "By the plain language of the statute, the 1.5-mile buffer applies only to identified (1) communities (2) in proximity to (3) sustained steep slopes; not an entire Project area that is 78% national forest in rolling terrain, most of which is miles away from any structures." (Doc. 78 at 46) (emphasis omitted). Having already established

43

that the USFS validly identified at-risk communities, the court need only address the second and third components of Plaintiffs' assertions.

Notably, Plaintiffs do not challenge whether 30% is a steep enough slope to merit a 1.5-mile buffer. Rather, Plaintiffs contend that USFS has not shown that the slopes are sustained, or sufficiently proximal to the community.

In defense of the broadly applied 1.5-mile buffer, Defendants refer to USFS' "Round Star HFRA Defined WUI Map." In addition to displaying a WUI boundary, the map also highlights slopes greater than 30% across the Project Area. (FS008969). According to Defendants, the presence of slopes exceeding 30% incline and the attendant risk of increased fire behavior are sufficient to support the inclusion of a 1.5-mile buffer around all communities across the Forest. Defendants also cite two separate documents that address mapping the WUI boundary. These are the "Flathead National Forest 2024 HFRA Analysis Process" document  and the "Region 1 Directions for populating the New HFRA At-Risk Communities and Evacuation Routes Datasets" document. (FS008968, FS008963-67).

However, none of the record documents cited by Defendants explain the details of how the agency determined that the 30% slopes were close enough to the at-risk communities to justify the 1.5-mile buffer under 16 U.S.C. § 6511(16)(B)(ii)(I). Admittedly, the statute is somewhat vague as to how proximity

should be interpreted. But it cannot be that the presence of sustained steep slopes somewhere or anywhere near at-risk communities is sufficient to justify the increased buffer. Further, it is not clear from the cited portions of the record how USFS determined that the 30% slopes were "sustained."

Without some explanation, the Court cannot reasonably determine compliance with the statute, and therefore with the Forest Plan and NFMA. None of this is to say that USFS' determination regarding the slopes and fire behavior was incorrect. The Court only finds that it cannot determine compliance based on the record as it now stands.

### c.    Environmental Impact Statement (Claim Four)

Plaintiffs next challenge USFS' conclusion that the Project did not warrant the preparation an environmental impact statement under NEPA. Plaintiffs specifically challenge the EA's cumulative effects analysis and analysis of impacts to endangered species. Plaintiffs also argue that an EIS is merited given that the Project allegedly threatens violations of federal law.

NEPA has undergone substantial revisions and permutations in recent years. As Defendants point out, Plaintiffs' arguments in their opening brief rely in part on the 2019 version of the NEPA regulations and 40 C.F.R. § 1508.27 (2019). Defendants argue that, given the date of the Project approval, the 2022 NEPA regulations are applicable and therefore 40 C.F.R. § 1501.3 (2022) governs the

issue of significance. Plaintiffs appear to concede this point, and adjust the scope of their reply accordingly. (Doc. 78 at 47).

As a threshold matter, Plaintiffs downplay the precedential effect of the Supreme Court's decision in *Seven County Infrastructure Coalition v. Eagle County.* 605 U.S. 168 (2025). Plaintiffs imply that *Seven County* is inapposite where the questions before the reviewing court involve projects that overlap in space and time. (Doc. 78 at 49). That interpretation dramatically undervalues the impact and applicability of *Seven County* on NEPA litigation. Specific facts aside, "[t]he bedrock principle of judicial review in NEPA cases can be state in a word: Deference." *Seven County*, 605 U.S. at 185.

### 1.    Cumulative Effects

Plaintiffs argue that the Project may have cumulatively significant impacts on wildlife, in combination with impacts from activities on non-federal lands and the "adjacent and overlapping" Cyclone Bill and Stovepipe projects. (Doc. 64 at 42-43). Accordingly, Plaintiffs argue that the Project's allegedly deficient cumulative effects analysis merits the preparation of an EIS.

Cumulative effects "are effects on the environment that result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions . . . ." 40 C.F.R. § 1508.1(g)(3)(2022). To prevail on a cumulative effects claim, environmental plaintiffs "need not show

46

what impacts would occur. To hold otherwise would require the public, rather than the agency, to ascertain the cumulative effects of a proposed action." *Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't. of the Interior*, 608 F.3d 592, 603 (9th Cir. 2010).

### A.     Activities on Non-Federal Lands

In their opening brief, Plaintiffs address the EA's analysis of actions on non-federal lands in the Project area.

> Because the EA fails to sufficiently consider cumulative impacts from state and private actions within the Project area to grizzly bear and lynx . . . . it is reasonable to conclude substantial questions remain as to whether impacts from these actions will be cumulatively significant.

(Doc. 64 at 43). Yet, on reply, Plaintiffs seem to discard their arguments regarding non-federal lands. Plaintiffs acknowledge that their opening brief cited the wrong NEPA regulations. It is unclear whether Plaintiffs—having pivoted to applying the appropriate NEPA regulations—intended to concede the issue regarding non-federal lands.

In any event, as Federal Defendants point out, the Project Biological Assessment is incorporated into the EA's analysis regarding grizzly bear and lynx. (FS004794, FS004802). As the Court has addressed in greater detail above, relevant activities on non-federal lands are addressed in the Biological Assessment, particularly as those activities pertain to lynx and grizzly bear. Accordingly, the

Court finds Plaintiffs' arguments on this issue unavailing.

### B. Cyclone Bill Project

Plaintiffs next argue that the EA's cumulative effects analysis failed to address the adjacent Cyclone Bill Project, which was approved less than a year after the Round Star Project. (Doc. 64 at 43) (citing FS004706, FS-SUPP-492). Plaintiffs argue that because the Cyclone Bill Project will have similar impacts to grizzly bear and lynx and was reasonably foreseeable, it should have been addressed in the Project EA. In response, Defendants raise three primary arguments.

First, Defendants argue that the EA validly aggregated cumulative impacts from relevant timber projects. The Ninth Circuit has repeatedly held that NEPA does not necessarily require individualized analysis of relevant projects. Instead, agencies may "aggregate" the effects of relevant projects in their cumulative effects analysis. "An aggregated cumulative effects analysis that includes the relevant past-timber-sale inputs comports with this standard, and also furthers NEPA's purpose of "concentrat[ing] on the issues that are truly significant to the action in question." *League of Wilderness Defs.-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 549 F.3d 1211, 1218 (9th Cir. 2008). An aggregated cumulative effects analysis may also encompass future "reasonably foreseeable projects." *Cascadia Wildlands v. Bureau of Indian Affairs*, 801 F.3d 1105, 1112

48

(9th Cir. 2015).

According to AFRC, the Project EA included an aggregated analysis of relevant Projects, in satisfaction of the relevant NEPA requirements. (Doc. 73 at 47). However, as Plaintiffs point out, the Cyclone Bill Project is not included in that aggregated analysis. Ninth Circuit Precedent is clear—an aggregated cumulative effects analysis may be appropriate, but that analysis must nevertheless include "relevant past-timber-sale inputs" and "reasonably foreseeable projects." *League of Wilderness Defs.-Blue Mountains Biodiversity Project v. U.S. Forest Serv.,* 549 F.3d 1211, 1218 (9th Cir. 2008); *Cascadia Wildlands v. Bureau of Indian Affairs*, 801 F.3d 1105, 1112 (9th Cir. 2015). Cyclone Bill is plainly not addressed in the EA's aggregated cumulative effects analysis. (FS012015-16). The fact that USFS compiled an aggregated analysis of other forest projects does not, of itself, explain the omission of the Cyclone Bill Project.

Defendants next argue that omitting Cyclone Bill from the EA's cumulative effects analysis was reasonable, given the fact that Cyclone Bill was not authorized when the Round Star EA was finalized. Therefore, Defendants argue, the Cyclone Bill Project was not "reasonably foreseeable." Because it was not reasonably foreseeable, Defendants argue, Cyclone Bill did not merit inclusion in the EA's cumulative effects analysis.

In preparing an EA, it is not arbitrary and capricious for an agency to omit

an adjacent, future project from NEPA cumulative effects analysis from an EA when the details of the future project are unknown at the time of the EA. *Environmental Protection Information Center v. USFS*, 451 F.3d 1005, 1015 (9th Cir. 2006). However, "projects need not be finalized before they are reasonably foreseeable." *Northern Plains Resource Council, Inc. v. Surface Trans. Bd.,* 668 F.3d 1067, 1079 (9th Cir. 2011). The "incipient notion" of a project is not sufficient to establish reasonable foreseeability. *Theodore Roosevelt Conservation Partnership v. Salazar*, 616 F.3d 497, 513 (D.C. Cir. 2010).

Here, although the process for approving and implementing the Cyclone Bill Project lagged behind the Round Star Project, Cyclone Bill was nevertheless reasonably foreseeable and should have been included in the Project cumulative effects analysis. As Plaintiffs highlight, multiple documents in the record establish that the two projects were often discussed together in meetings well in advance of the final EA. Moreover, USFS issued the scoping notice for the Cyclone Bill project in March 2023. (FS-Supp-479). In April 2024—over a year later—USFS issued the Round Star Final EA. (FS004792). This significant overlap establishes that, when the Project EA was issued, Cyclone Bill was more than merely contemplated or an "incipient notion." *Theodore Roosevelt Conservation Partnership v. Salazar*, 616 F.3d at 513.

Even if the Project cumulative effects analysis was deficient for having

50

omitted the Cyclone Bill Project, Defendants argue that any such omission would be harmless error following the Ninth Circuit's decision in *Idaho Sporting Congress v. Thomas.* 137 F.3d 1146 (9th Cir. 1998). In that case, the court considered whether, for one project, a supplemental EA was necessary following the approval of second project, where the two projects together might create cumulative effects. Ultimately, the court held that, because the EA for the second project adequately addressed cumulative effects of both projects, there was no need for a supplemental EA for the first project. "Since the effects of the two sales were accounted for in the [second project] cumulative impacts analysis, we do not require duplication in [the instant] EA." *Thomas*, 137 F.3d at 1152.

Defendants argue that, in this case, the NEPA analysis for the Cyclone Bill Project sufficiently addresses the cumulative effects of that project and the Round Star Project. Accordingly, they argue, it would be unnecessarily duplicative for the Court to require USFS to include analysis of the Cyclone Bill Project as part of the Round Star NEPA process. Defendants conclude that, following *Thomas*, any omission of the Cyclone Bill project from the cumulative effects analysis was therefore harmless error.

Ultimately, *Thomas* is not dispositive of this issue for two reasons. First, that case addresses the requirements for preparing a supplemental EA. In contrast, this case concerns the requirements for cumulative impacts analysis for a neighboring

51

project that was identified at the time when the Project EA was finalized. Accordingly, *Thomas* is distinguishable from the matter at hand. Second, in *Thomas,* the court indicated that the existence of the second project's cumulative effects analysis did not fully resolve the issue. "However, that does not answer the question of whether the study was adequate. We note that evidence of the Forest Service's cumulative impact study is sparse. However, since we require an EIS [on other grounds], any inadequacy in the analysis of cumulative impacts can be addressed there." *Thomas*, 137 F.3d at 1152. Accordingly, *Thomas* does not excuse the omission of Cyclone Bill as harmless error.

Finally, Defendants argue that under *Seven County Infrastructure Coalition v. Eagle County*, USFS' cumulative effects analysis is owed "substantial deference." *Seven County Infrastructure Coalition v. Eagle County*, 605 U.S. 168 (2025). According to the Supreme Court, when reviewing an agency's NEPA analysis "[c]ourts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness." *Seven County*, 605 U.S. at 183. That deference extends even to instances where a court may disagree with the agency's determination of how to limit its NEPA analysis. "[E]ven if the reviewing court . . . might think that NEPA would support drawing a different line, a court should defer to an agency so long as the agency drew a reasonable and 'manageable line.'" *Seven County*, 605 U.S. at 191

(citations omitted). The issue of remedy is also encompassed by the Court's realignment of NEPA analysis. "[E]ven if the [agency's NEPA analysis] drew the line on the effects of separate upstream or downstream projects too narrowly, that mistake would not necessarily require a court to vacate the agency's approval of the . . . project." *Seven County*, 605 U.S. at 185.

Here, USFS omitted a reasonably foreseeable project in its cumulative effects analysis. The question then becomes whether the deference owed to USFS under *Seven County* is sufficient to tilt the scales in the agency's favor. Considering the adjacency of the two projects in time and space, there appears to be no question that, in some form, the cumulative effects of the two projects should have been addressed. And because Cyclone Bill was reasonably foreseeable, it should have been addressed in the Round Star EA. Ultimately, deference to the agency cannot overcome the plain language of the relevant NEPA regulation:

> Cumulative effects, which are effects on the environment that result from the incremental effects of the action when added to the effects of other past, present, and *reasonably foreseeable* actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.

40 C.F.R. § 1508.1(g)(3)(2022) (emphasis added). Following the then-applicable NEPA regulations, USFS was required to include reasonably foreseeable actions in its effects analysis. The substantial deference USFS owed does not alter that conclusion.

## C.    Stovepipe Project

Plaintiffs next allege that the adjacent Stovepipe Project was not adequately addressed for cumulative effects on grizzly bear and lynx. (Doc. 78 at 54). In response, Defendants offer that the EA incorporates information regarding the effects of the Stovepipe project on lynx. (FS012021, FS012024). In light of *Seven County*, Defendants allege that the Stovepipe Project was considered, and that USFS drew a "manageable line" in deciding which effects of the Stovepipe Project to address. Crucially, that line excludes analysis relating to impacts on grizzly bear.

The references to the Stovepipe Project cited by Defendants are minimal at best. Analyzing the impacts of the Project (and alternatives) on Canada Lynx, the EA includes multiple references to "project file exhibit Q001." (*See* FS004793-94, FS004796-97, FS004799-800). The EA therefore incorporates Exhibit Q001 by reference. Exhibit Q001 refers to a document titled "Canada Lynx Existing Condition and Effects Analysis Round Star Resource Management Project", which is included in the administrative record. (FS012020-37). The Stovepipe Project is mentioned three times, although only the first two instances appear relevant to this issue.[5]

---

[5] The third mention of the Stovepipe Project falls under the heading "Testing of Models for Multistory Habitat via Field Verification" and merely indicates "[t]he queries above were derived from the queries built for the Stovepipe Resource Management Project." (FS012023-24).

The first reference to the Stovepipe Project in Exhibit Q001 is found in a section describing how USFS determined compliance with Lynx Amendment Standard VEG S1. The relevant language indicates that the analysis for forest conditions and regeneration harvest in the Lost Tally Lynx Analysis incorporated data from the Stovepipe Project. (FS012021). In the second instance, similar information is incorporated into the analysis concerning compliance with Lynx Amendment Standard VEG S2. (FS012021).

Defendants generally admit that the Stovepipe Project is not mentioned in any analysis concerning grizzly bear. However, Federal Defendants offer that this decision was based conclusions derived from the NEPA analysis and ESA consultation completed for the Stovepipe Project. (Doc. 83 at 38). Specifically, Federal Defendants highlight the Stovepipe Project's Biological Assessment, which indicates that "[t]he [Stovepipe Project] would have minor impacts to grizzly bears due to the influence of project activities." (FS-SUPP-023). Similarly, FWS determined that "we expect all effects of the [Stovepipe Project] on grizzly bears to be insignificant or discountable." (FS-SUPP-059).

In light of these prior determinations regarding the impacts of the Stovepipe Project, Federal Defendants argue that the Stovepipe Project is not relevant to addressing cumulative impacts on grizzly bears and therefore need not have been included to that effect in the Round Star EA. Federal Defendants further cite the

55

substantial deference that USFS is owed in its determinations under *Seven County.*

Specifically, Federal Defendants argue that the choices regarding where and how

to include information regarding the Stovepipe Project demonstrate that the agency

drew a "manageable line" that must be upheld.

Ultimately, USFS' decisions regarding the scope of its effects analysis

related to the Stovepipe Project shows evidence of a faint but "manageable" line. It

appears that the agency was at least aware of and considered the Stovepipe

Project's effects on lynx, and chose only to address those effects as they impacted

compliance with Lynx Amendment Standards. Similarly, there is evidence in the

record to support the agency's apparent decision to omit analysis regarding the

Stovepipe Project's impacts on grizzly bear. Under *Seven County,* that is enough.

### 2.      Effects on ESA-Listed Species

Plaintiffs next argue that the Project may have significant effects on ESA-

listed species, and therefore USFS should have prepared an EIS. Plaintiffs base this

argument on the fact that "Round Star activities may affect and are likely to

adversely affect lynx, lynx critical habitat, and grizzly bears." (Doc. 78 at 57)

(Citing FS012041). Plaintiffs' reply brief clarifies that this challenge is made in

light of 40 C.F.R. § 1501.3(b)(1) (2022), which instructs that when determining

significance, the agency should consider "the affected area (national, regional, or

local) and its resources, such as listed species and designated critical habitat under

the [ESA]." "Thus, under this significance factor, the Forest Service must conduct an EIS because there are likely significant impacts to listed-species." (Doc. 78 at 58).

Plaintiffs also cite to *Environmental Defense Center v. Bureau of Ocean Energy Management*. 36 F.4th 850 (9th Cir. 2006). In that case, the Ninth Circuit held that a "finding of adverse effects, especially *after* the EA was published, is *prima facie* evidence that an EIS should have been prepared." *Environmental Defense Center*, 36 F.4th at 879. In response, Defendants argue that "no jeopardy" findings for lynx and grizzly bear provide support that effects are non-significant. (*See* FWS000005, FWS000036).

The parties' basic disagreements on this issue can be summarized as follows. Plaintiffs argue that a "may affect" or "likely to affect" finding by FWS is strong evidence in support of preparing an EIS. Defendants argue that a "no jeopardy" finding by FWS is likewise strong evidence that an EIS is not necessary. With those data points in mind, USFS' decision regarding the preparation of an EIS necessarily involved "a series of fact-dependent, context specific, and policy-laden choices about the depth and breadth of its inquiry." *Seven County*, 605 U.S. at 183. As such, USFS' determination is entitled to substantial deference.

Plaintiffs have not demonstrated that the potential impacts to wildlife were significant enough that USFS' determination fell outside of a "broad zone of

reasonableness." *Seven County,* 605 U.S. at 183. Nor have Plaintiffs alleged a clear violation of any regulation or statute on this issue, beyond the deficiencies related to the Cyclone Bill Project, as noted above. Accordingly, the Court defers to the agency's determination on this issue.

### 3.      Violations of Federal Law

Plaintiffs next allege that the Project threatens three violations of environmental law and therefore an EIS is required. (Doc. 78 at 59). USFS' obligation to consider effects that would violate environmental laws is established in 40 C.F.R. § 1501.3(b)(2)(iv) (2022). Each of the alleged violations relates to standards set forth in the Lynx Amendment.

The first two alleged violations concern USFS' application of the HFRA WUI definition. Plaintiffs reiterate their argument that the agency relied on a definition of the WUI that did not comply with the requirements of the Forest Plan, and that this noncompliance raises substantial questions "as to the significance of the Project." (Doc. 64 at 50). As addressed in greater detail above, the Court agrees that USFS has failed to demonstrate compliance with the applicable Forest Plan standards, in violation of NFMA. Accordingly, Plaintiffs' arguments on this issue have merit.

Plaintiffs also allege a violation of an additional Lynx Amendment standard, written into the Forest Plan as Standard VEG S2. With some caveats, Standard

58

VEG S2 states that "[t]imber management projects shall not regenerate more than 15 percent of lynx habitat on [National Forest System] lands within a [Lynx Analysis Unit] in a ten-year period." (FS000228). Plaintiffs claim that although the Project EA indicates otherwise, regeneration treatments will exceed the 15 percent limit in the Evers Reid Lynx Analysis Unit over the next ten years.

The record indicates that, post-project, the Evers Reid Lynx Analysis Unit will be 13.6 "Percent Regenerated in 10 Years." (FS012049). While Plaintiffs indicate that this regeneration might otherwise satisfy the requirements of Standard VEG S2, the EA does not incorporate regeneration resulting from the Cyclone Bill Project. Accordingly, Plaintiffs argue, "[b]y omitting the Cyclone Bill Project entirely from its analysis, the Round Star Project fails to disclose or consider the actual number of acres that will be regenerated in the Evers Reid [Lynx Analysis Unit] over the next decade and the Forest Service cannot demonstrate compliance with VEG S2, in violation of the Forest Plan." (Doc. 64 at 51).

In response, Defendants argue that USFS interpreted this standard to refer only to impacts from projects conducted or authorized within the last ten years. (Doc. 68 at 51). USFS' interpretation of its own Forest Plan warrants deference. *Earth Island Institute v. USFS.,* 697 F.3d 1010, 1013 (9th Cir. 2012). The Cyclone Bill Project was not authorized at the time when the EA was finalized. Therefore, under USFS' interpretation of Standard VEG S2, regeneration would not exceed

59

15 percent on the relevant Lynx Analysis Unit. Accordingly, Plaintiffs have not demonstrated that this issue threatens a violation of Standard VEG S2 and NFMA.

## IV.   Remedy

Plaintiffs request that the Court "vacate the Project Decision Notice and Finding of No Significant Impact, or in the alternative, enjoin implementation of the Project [and] remand to the Agencies until such time as the agencies demonstrate to this Court that they have adequately complied with the law." (Doc. 64 at 51). Defendants do not address the specifics involved in determining a remedy, but request additional briefing on the issue.  (Doc. 68 at 52)

Vacatur typically accompanies a remand under the APA. *Alliance for the Wild Rockies*, 907 F.3d at 1121. However, where an agency's error "is limited in scope and severity, and vacatur would result in a disproportionate disruption to the [p]roject," remand without vacatur may be warranted. *Alliance for the Wild Rockies v. Savage*, 375 F. Supp. 3d 1152, 1156 (D. Mont. 2019). A court "is not required to set aside every unlawful agency action" even though it has the power to do so. *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995) (citation omitted).

Particular to NEPA, the determination that a Finding of No Significant Impact is arbitrary and capricious does not always require preparation of an EIS. *Alliance for the Wild Rockies v. Gassmann*, 678 F. Supp. 3d 1249, 1297-98 (D.

Mont. 2023), citing *Ctr. for Biological Diversity v. Nat'l. Highway Traffic Safety Admin.*, 538 F.3d 1172, 1225 (9th Cir. 2008). When there is uncertainty over the impact of a proposed project caused by an inadequate EA, "the court should ordinarily remand for the agency to either prepare a revised EA or reconsider whether an EIS is required." *Ctr. for Biological Diversity v. Natl. Hwy. Traffic Safety Admin.*, 538 F.3d 1172, 1179 (9th Cir. 2008).

Considering the limited scope of the errors above, the Court finds that vacatur is not necessary. It is possible that the agency may be able to resolve the errors that the Court has noted with minimal delay and disruption to the Project. Accordingly, the Court declines the request for supplemental briefing, and orders that the Project be enjoined and remanded to the agencies for further review.

Regarding the Project NEPA analysis, the Court finds it appropriate to remand to allow the Defendants to follow their ordinary processes, in line with the deficiencies identified above, to determine whether an EIS is required or whether the issues may be adequately addressed in a revised EA.

## V.    Conclusion

For the reasons set forth above and consistent with that analysis,

IT IS ORDERED that the parties' cross-motions for summary judgment (Docs. 63, 67, 72, 75) are GRANTED in part and DENIED in part as follows:

1.    Plaintiffs' motion for summary judgment (Doc. 63) is GRANTED as

to: Claim Two insofar as Federal Defendants violated NFMA by failing to reasonably demonstrate compliance with Lynx Amendment standards in the Forest Plan; Claim Four insofar as Federal Defendants violated NEPA by not taking a hard look at cumulative effects related to the Cyclone Bill Project and threatened violations of the Lynx Amendment standards.

2.    Federal Defendants and Defendant-Intervenors are entitled to summary judgment on all other claims.

IT IS FURTHER ORDERED that Federal Defendants are ENJOINED from implementing the Project and this matter is REMANDED to Federal Defendants to address the deficiencies identified in this Order.

DATED this 31st day of March, 2026.

_____
Kathleen L. DeSoto
United States Magistrate Judge

62